## UNITED BLOCK CO., Inc., v. HELVERING, Com'r of Int. Rev.

### No. 28.

Circuit Court of Appeals, Second Circuit.

Dec. 1, 1941.

George H. Harris, of Rochester, N. Y., and James P. Quigley, of Olean, N. Y. (Hugh J. O'Brien, of Rochester, N. Y., and Earl C. Vedder, of Olean, N. Y., of counsel), for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch and Carlton Fox, Sp. Assts. to Atty. Gen., for respondent.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This case comes up upon a petition to review an order of the Board of Tax Appeals, assessing a penalty under § 102(a) of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Acts, page 690, against the taxpayer for its fiscal year ending September 30, 1936. The question is whether there was substantial evidence to support the Board's finding that the taxpayer, a corporation, had been "availed of" for the purpose of preventing the imposition of a surtax on its shareholders. The company makes "rough last blocks" from which finished "lasts" are made that are used in the manufacture of shoes; before 1932 this had been its only business but in that year it added the manufacture of rough tenpin blocks. It had been formed in 1917 by the merger of three independent block companies, and its shares were closely held, practically all of them being in the hands of seven individuals. It had had a large and satisfactory business—its gross sales in 1926 being over a million dollars—and it did not begin seriously to feel the depression until 1931; but in the year 1931–32 its sales dropped to $445,000, to $400,000 in 1932–33, and they were only $492,000 in 1933–34. Thereafter its business began to pick up; in 1934–35 sales were $619,240 and for the year in question, 1935–36, they were $784,000 against an average of $862,987 for the ten years before 1931–32. Considering the good prospects at the end of 1936 for further improvement—which were in fact amply realized—it can be said that the company had, at least for the time, recovered from the depression. It argues that the quick assets which it kept in reserve in that year were not so large as to permit the inference that they were retained in order to protect the shareholders against surtaxes, because they were no more than were reasonable for its needs. It says that the controlling factor was the ratio between gross sales and capital; a ratio which it had deliberately kept at about the average of 1 to 1.46 over the whole period of its activities. As will appear, we think this test valueless, but, even though we accept it, it will not serve, for the ratio of sales to capital for the year 1935–36 was 1 to 1.70 though we deduct, as the taxpayer wishes, an account receivable of $150,000 which it says that it had determined to be worthless during the year. That ratio had been equaled only once—in 1930— before the depression, and had been approached only in two other of those years—1929 and 1931. It seeks to explain the excess in 1936 by suggesting that its officers already had an eye upon new timber lands which would cost $400,000; but the Board was skeptical as to this, for the lands were not bought until 1938, and then only after a change in the management. Certainly the Board was not compelled to believe that this prospect compelled it to retain $530,000 of fluid assets in the year 1935–36.

However, as we have just said, we cannot agree that the ratio between sales and capital throws any strong light upon the taxpayer's purposes. The really important question is, not how much capital of all sorts, but how much quick assets, it was reasonable to keep on hand for the business; it is on these averages for the years before the depression that a better inference may be founded. We have calculated these in two ways; first, by including not only cash, notes receivable and in-

vestments, but also accounts receivable; and, second, by excluding accounts receivable (in both cases deducting notes and accounts payable). From the subjoined tables * it will be seen that, if accounts receivable be included, the taxpayer kept only 27.3% of its sales in quick assets for the years 1922–1926, and 60.2% for the years 1927–1931, as against 78.3% for the year of the assessment, 1935–36; and that, if they are excluded, these figures are 3.1% for 1922–1926 and 13.5% for 1927–1931, as against 67.6% for the year of the assessment. It does not make a great deal of difference for the purposes of the argument whether or not the accounts are included, because, even if they are, the disparity supports the Board's finding. But the proof amounts nearly to a demonstration if we exclude the accounts and it seems more reliable to do so. Accounts receivable are, to say the most, a questionable quick asset; for although merchants do at times assign them in regular course and perhaps manufacturers also,

the practice is not common, so far as we know; and at best it is an expensive way to raise money, and one not calculated to improve the credit of him who has recourse to it. We conclude therefore that there was a substantial evidence to support the Board's finding.

■■ The taxpayer next asserts that, properly speaking, it had no income for the year 1935–36 upon which the penalty could be levied. This argument runs as follows. As we have already said, during the year 1935–36 it ascertained that an account of $150,000 had become worthless; this it wished to charge off as a bad debt, and would have done so had not a revenue official advised it that it could not. If it had deducted this debt, it would have had no income, for it reported only $124,207; and if it had had no income, no penalty could be levied. It is not just that a penalty should be levied because of its mistake in failing to take the deduction in the right year. All this is at best in misericordiam, and could not prevail even if the injustice was as the taxpayer thinks it; because, harsh as it may be, one accepts the advice of a revenue official at his peril. But in fact this taxpayer has not shown that it has suffered any injustice, even though we assume that it could have deducted the debt in 1935–36. We have no reason to suppose that it would have distributed its accumulated earnings during the next year; and if it did not, it would have been subject to a penalty in that year upon an income greater by $150,000 than that which it reported, for it did deduct the debt in 1936–37. That income would have been about $158,000 instead of the $124,207 on which the penalty was imposed. Thus, on any showing the taxpayer lost no more than the chance of showing that its purpose had changed in 1936–37 from what it had been during the year before. Perhaps it could have done so; no one can tell, but the chance is too speculative to support even the kind of argument put forward.

Order affirmed.

| Year | Net quick assets including accts. receivable | Ratio of net quick assets to sales | Net quick assets excluding accts. receivable | Ratio of net quick assets to sales |
|---|---|---|---|---|
| 1918 | minus | 0 | minus | 0 |
| 1919 | minus | 0 | minus | 0 |
| 1920 | $ 17,257 | 1.3% | minus | 0 |
| 1921 | 13,664 | 1.8% | minus | 0 |
| 1922 | 126,001 | 14.6% | minus | 0 |
| 1923 | 180,074 | 23.5% | minus | 0 |
| 1924 | 265,363 | 32.5% | $ 42,664 | 5.2% |
| 1925 | 260,361 | 28.3% | minus | 0 |
| 1926 | 388,430 | 37.8% | 103,269 | 10.1% |
| 1927 | 511,738 | 57.4% | 129,190 | 14.5% |
| 1928 | 489,692 | 50 % | 100,698 | 10.4% |
| 1929 | 518,488 | 64.5% | 74,260 | 9.2% |
| 1930 | 452,892 | 57.9% | 93,362 | 11.9% |
| 1931 | 571,015 | 71.4% | 172,837 | 21.6% |
| 1932 | 588,132 | 131. | 253,240 | 56.8% |
| 1933 | 619,366 | 152. | 369,917 | 91.0% |
| 1934 | 666,631 | 135.3 | 400,691 | 81.3% |
| 1935 | 664,763 | 107.3 | 494,317 | 79.8% |
| 1936 | 614,949 | 78.3 | 530,026 | 67.6% |
| Average 1922-26 | | 27.3% | | 3.1% |
| Average 1927-31 | | 60.2% | | 13.5% |