John F. Boyle Company v. Commissioner.
John F. Boyle Co. v. Commissioner
Docket No. 1612.
United States Tax Court
1944 Tax Ct. Memo LEXIS 2; 3 T.C.M. (CCH) 1335; T.C.M. (RIA) 44410; December 29, 1944
*2 Petitioner failed to distribute its current earnings, claiming that the amounts were needed to finance a planned expansion of its plant and equipment. Held, that petitioner was availed of in the taxable years for the purpose of preventing the imposition of the surtax upon its shareholder through the medium of permitting its earnings or profits to accumulate instead of being divided or distributed. John A. Conlin, C.P.A., Federal Trust Bldg., Newark, N.J., and J. Fisher Anderson, Esq., 15 Exchange Place, Jersey City, N.J., for the petitioner. Robert S. Garnett, Esq., for the respondent. TYSON mined deficiencies against petitioner in income tax for the taxable years 1938 and 1939 in the respective amounts of $20,417.70 and $14,101.73. The deficiencies result principally from respondent's determination that the petitioner "was availed of during the years 1938 and 1939 for the purpose of preventing the imposition of the surtax upon shareholders within the purview of Sections 102 of the Revenue Act of 1938 and of the Internal Revenue Code." Petitioner contests this determination on the ground that certain capital improvements needed to modernize its plant, and planned by it, required *3 the retention of all its earnings in the taxable years and that such retention was a reasonable act of management. There were other adjustments not in controversy. Findings of Fact Petitioner is a corporation organized in 1909 under the laws of the State of New Jersey, with an authorized capital stock of 1,250 shares of the par value of one hundred dollars each, of which 10 shares were then subscribed. It filed its income tax returns for the calendar years 1938 and 1939 on an accrual basis with the collector of internal revenue for the fifth district of New Jersey. Petitioner's plant is located in Jersey City, New Jersey. It is engaged in the manufacture and sale of box board. The box board is manufactured by putting paper waste through beaters which thrash out the stock and restore it to its virgin state of pulp. It is then refined through the use of Jordan engines in pumping it through screens, from which it then goes on to a cylinder paper-making machine and is formed under steam pressure into a sheet, dried, and cut by 97 machines into finished stock. The papermaking machine consisted of a "wet end" unit erected in 1938 and 97 dryers, two-thirds of which were erected in 1914. *4 The paper-making machine is operated as one unit and any break in the line necessitates a complete shut down of operation until the break is repaired. John F. Boyle, Jr. has been associated with petitioner for 25 years. In 1929 he succeeded his father, John F. Boyle, Sr., as its executive head, and has been its vice president and general manager since that date. It had no president. In 1933 and all years thereafter its outstanding capital stock was $125,000 consisting of 1,250 shares, of which John F. Boyle, Jr. owned 1,248 shares, two qualifying shares being held by others. The salary paid John F. Boyle, Jr. by petitioner during the years 1933 to 1939, inclusive, was $15,000 per annum. He was also paid commissions during that period totaling $48,670.06, of which $5,588.97 was paid in 1938 and $7,126.36 in 1939. At the date of hearing petitioner's manufacturing plant consisted of the following structures: (1) A two-story frame building built in 1896 and used for storage of baled waste paper constituting the raw material from which the box board is manufactured. The building was constructed to store bales weighing about 200 pounds each. Due to the development and use of hydraulic *5 presses, similar sized bales have now increased in weight to between 1,200 and 1,500 pounds. This increased weight produced strain and some misalignment of the building. The building was reinforced and repaired so as to support the added weight and was continued in use for the same storage purposes. (2) A two-story brick, concrete, and steel building built in 1914 in which is contained the paper machines used to manufacture the box board product. It is still a good building. (3) A one-story brick building erected in 1935 and 1936, and used as a storage building for the finished box board and as a garage. (4) An "old" boiler house erected in 1914 and containing the boilers used in operating the plant. (5) A new boiler house intended when completed to replace the "old" boiler house. The construction of the new boiler house containing two new boilers, was begun in 1940, but has not been completed through lack of priority rating to obtain needed steel material required to place the new boilers in operation. The cost of the work completed thereon at the date of the hearing in December 1943, is $22,697.38 for the boiler house, and $51,440.73 for the new boilers and settings. The buildings *6 numbered (1) to (4), inclusive, above were being used at the date of the hearing as they had theretofore been used. The greater part of petitioner's output is sold to eight or ten customers which it has had for many years. All its accounts are readily collected, though it extends credit of sixty or ninety days to some old customers. Petitioner's records disclose capital expenditures on building, machinery and equipment for the years 1934 to 1942, inclusive, as follows: Machinery
Year
Buildings
and Equipment
1934
$ 5,720.77
$ 21,523.54
1935
27,727.12
15,486.16
1936
56,222.71
15,651.76
1937
20,006.91
1938
20,550.06
1939
885.50
876.12
1940
8,235.22
23,218.79
1941
15,368.16
107,185.42
1942
7,774.35
459.82
Total
$121,933.83
$224,958.58
Other expenditures for delivery and office equipment were disclosed by petitioner's records as follows: Delivery
Office
Year
Equipment
Equipment
1935
$16,830.01
1936
12,200.00
1939
3,436.50
$ 320.00
1940
517.75
1941
365.00
Total
$32,466.51
$1,202.75
Petitioner's earned surplus as of December 31, 1933, through December 31, 1941, was as follows: Year
Earned Surplus
1933
$ 827,927.22
1934
957,138.80
1935
1,057,190.85
1936
$1,110,738.72
1937
1,145,764.35
1938
781,219.17
1939
832,798.96
1940
1,298,762.63
1941
1,433,269.93
*7 The pronounced drop in surplus in the taxable years 1938 and 1939 involved herein, resulted from the act of petitioner, on advice of its tax advisor, in setting up a reserve for losses and bad debts of $412,282.11, being the full amount of notes and accounts receivable owed petitioner by the estate of John F. Boyle, Sr. and the Central Storage and Realty Company, both hereinafter referred to. A reserve of $25,000 was similarly set up in those years representing an investment in Owen & Trager stock. In 1940, apparently on the advice of petitioner's tax advisor, both items of $412,282.11 and $25,000 were withdrawn from the reserve for losses and bad debts and restored to surplus. Petitioner's financial statements disclose cash on hand on December 31, of each of the years 1933 to 1941, inclusive, as follows: 1933
$ 93,620.28
1934
231,043.51
1935
295,660.01
1936
289,796.06
1937
337,524.89
1938
399,620.41
1939
457,195.38
1940
500,045.03
1941
502,774.28
Petitioner's balance sheet as of December 31, for the years 1937 to 1941, inclusive, was as follows: ASSETS
1937
1938
1939
1940
1941
Cash
$ 337,524.89
$ 399,620.41
$ 457,195.38
$ 500,045.03
$ 502,774.28
Accounts and Bills Receiv-
able
99,416.60
75,058.62
117,674.52
119,363.59
166,814.54
Other Accounts and Notes
412,282.11
412,282.11
412,282.11
412,282.11
412,282.11
Merchandise Inventory
14,921.23
45,343.13
25,671.33
52,774.73
35,375.98
Land and Buildings
295,919.27
295,919.27
296,804.77
305,039.99
320,408.15
Machinery and Equipment
360,002.40
379,929.02
384,889.38
389,531.34
493,309.82
Deferred Items
10,666.83
8,584.15
10,798.39
16,752.23
16,208.51
Investments - at cost
184,126.50
184,126.50
184,126.50
100,144.00
100,144.00
Total - Before Reserve
for Depreciation
$1,714,859.83
$1,800,862.61
$1,889,442.38
$1,895,933.02
$2,047,317.39
Less Reserve for De-
preciation on Depre-
ciable Assets
391,391.40
413,639.90
435,137.98
435,484.39
430,955.18
TOTAL
$1,323,468.43
$1,387,223.31
$1,454,304.40
$1,460,448.63
$1,616,362.21
LIABILITIES AND
CAPITAL
Accounts Payable
$ 30,513.79
$ 25,381.66
$ 46,598.20
$ 19,450.32
$ 39,012.38
Dividends Payable
Taxes Payable
21,949.46
18,340.37
12,625.13
7,529.76
19,079.90
Accrued Expenses
240.83
9,705.92
Reserve - Other Accounts
and Notes Receivable
412,282.11
412,282.11
Reserve for Loss on Invest-
ments
25,000.00
25,000.00
Capital Stock
125,000.00
125,000.00
125,000.00
125,000.00
125,000.00
Surplus
1,145,764.35
781,219.17
832,798.96
1,298,762.63
1,433,269.93
TOTAL
$1,323,468.43
$1,387,223.31
$1,454,304.40
$1,460,448.63
$1,616,362.21
*8 Petitioner's net income for the calendar years 1938 and 1939 as disclosed by its returns and as "corrected" by respondent in his deficiency notice, which "corrected" amounts are not questioned by petitioner herein, was as follows: 1938
1939
Net income disclosed by
return
$90,537.25
$59,353.63
Corrected net income
95,432.24
64,145.73
Petitioner's investments in stocks of unrelated businesses at cost, held during 1938 and 1939, and date acquired, were as follows: Date Acquired
Cost
250 shs Owen & Trager
1922 (for debt)
$ 25,000.00
560 shs Commercial Trust
1930-31
75,820.00
1,209 shs Commercial Trust
1933
50,046.50
500 shs General Motors
1933
12,575.00
100 shs Montgomery Ward
1933
2,312.50
200 shs National Steel
1933
10,210.00
110 shs Hudson County Nat. Bank
1933
1,100.00
500 shs United Corporation
1933
7,062.50
$184,126.50
The market value of the above investments of petitioner as of December 31, in each of the years 1938 and 1939, was $94,706.75 and $101,419.75. The plant's net sales and production during the years 1933 through 1942 were as follows: Production
Sales (net)
in Tons
1933
$ 479,905.29
15,268
1934
516,650.51
14,338
1935
485,163.54
16,003
1936
547,057.98
20,724
1937
585,498.12
18,678
1938
454,462.25
19,254
1939
587,901.11
21,940
1940
678,421.39
24,005
1941
1,219,327.57
28,857
1942
992,769.16
24,052
*9 Petitioner held during the calendar years 1938 and 1939 "Notes receivable", with date acquired, as follows: 1938
Acquired
and 1939
Central Storage & Realty Co.
1924-27
$102,800.00
Central Storage & Realty Co.
1928
100,000.00
Est. of John F. Boyle, Sr.
1928
192,988.98
John F. Boyle, Sr.
Prior to
1930
16,493.13
$412,282.11
John F. Boyle, Sr. died in 1930 and the Commercial Trust Company of New Jersey, John F. Boyle, Jr., and Julia Moon, petitioner's secretary and treasurer, were appointed executors and trustees of his estate. They have never been discharged and are still administering the estate. John F. Boyle, Jr. is a director of the trust company, as was his father. Both he and the estate each own a large block of the trust company stock. Julia Moon was indebted to petitioner for $23,150 in 1933, which was reduced to $17,500 in 1936, at which figure it remained through 1939. The John F. Boyle, Sr. estate owns all the stock of the Boulevard Improvement Company and of the Central Storage and Realty Company. John Boyle, Jr. was and is president of the latter company. As of December 31, 1939 the estate owned other securities having a then market value *10 of $655,922.80 and had cash on hand of $33,805.02. It owned 5,767 shares of Commercial Trust Company of New Jersey which fluctuated between $27 and $29 per share in 1938 and 1939, and 3,750 shares common and 627 shares of preferred Hudson Dispatch whose value was not known. It also owned a $70,302.30 claim secured by collateral with a market value of $52,428.75. It owned numerous parcels of real estate, value not known as of 1938 and 1939, but having an appraised market value of $694,615 on July 21, 1930, the date of John F. Boyle, Sr.'s death, as shown by the estate tax return. All the above values were considerably less on the date of the death of John F. Boyle, Sr. in 1930 than they were on December 31, 1939. The only direct liabilities of the estate in the taxable years were amounts due petitioner of $192,988.98 and $16,493.13. The estate had contingent liabilities as follows: Dec. 31, 1938
Dec. 31, 1939
Bond secured by mort-
gage made by Hudson
Dispatch, guaranteed
by decedent
$125,000.00
$117,500.00
Note of Central Storage
& Realty Co., guar-
anteed by decedent
66,000.00
51,000.00
Note of Boulevard Im-
provement Co., en-
dorsed by decedent
13,000.00
7,000.00
$204,000.00
$175,500.00
*11 The assets and liabilities of the Central Storage and Realty Company as of December 31, 1938 and December 31, 1939 were as follows: Assets
1938
1939
Cash
$ 25,078.87
$ 28,861.44
Land, buildings, and
equipment, Net
571,754.87
556,362.75
Insurance paid in ad-
vance
3,334.29
4,831.13
$600,158.03
$590,055.32
Liabilities
Accounts Payable
$ 28,365.22
$ 39,040.13
Due petitioner, (John
F. Boyle Co.)
202,800.00
202,800.00
Due Commercial Trust
Co.
66,000.00
66,000.00
Due John F. Boyle, Jr.
8,600.00
4,600.00
Due Est. of John F.
Boyle, Sr.
10,000.00
10,000.00
Due Boulevard Improve-
ment Co.
44,580.69
44,580.69
Reserve for Soc. Sec.
Taxes
$ 152.35
$ 58.26
Capital Stock
34,500.00
34,500.00
Surplus
205,159.77
188,476.24
$600,158.03
$590,055.32
The profit and loss statement of the Central Storage and Realty Company showed income, expenses, and net loss for the years 1938 and 1939, as follows: Income
$70,248.40
$68,332.25
Expenses
86,666.42
85,015.78
Net Loss
$16,418.02
$16,683.53 Petitioner declared a dividend of $12,500 in 1934, and paid $5,000 thereof in that year, and paid the remaining $7,500 in 1935. This was the only dividend paid *12 during the years 1933 to 1941, inclusive. The respondent proposed the issuance of deficiency notices against petitioner for the year 1933 on the basis of unreasonable accumulation of surplus to avoid surtax under sections 104 and 102 of the Revenue Acts of 1932 and 1934, respectively. Petitioner filed protests against such action. In a statement pertaining to the protest dated November 18, 1935, John F. Boyle, Jr. stated by affidavit: "This definite statement is made: The policy of John F. Boyle, Jr. who is the sole stockholder and active manager of the John F. Boyle Company throughout the year of 1933 and to date, has a definite policy which he plans to carry on and that is to modernize the buildings and equipment and facilities of his own plant, to eliminate the hazards that now confront the business and to be in a position to meet this present acute competition * * *" Boyle's estimate of the cost of such modernization at that time was about $800,000. Boyle further stated in connection with the protest: "There were eight customers who during 1933 purchased from this company the finished product of this corporation in excess of $10,000 each; only three purchased in excess of *13 $50,000 each, and the average sales to these eight customers amounted to $386,082.01 out of a total gross sales of this corporation for 1933 of $484,891.80. Settlement of these large customers was mostly on a 30, 60 and 90-day basis." The customers above referred to and the time within which they settled their accounts continued practically unchanged to the date of the hearing. The protest as to 1933 named as the source of petitioner's 1933 acute competition the same two competitors as to which petitioner was apprehensive in 1938 and 1939. Petitioner has successfully competed against them from 1933 to 1942 through having improved the quality and quantity of its product. Under date of August 8, 1940, the General Electric Company wrote petitioner a letter confirming "our conversations" and giving the results of a survey made to determine "approximately what would be required in motorizing the machinery and generating the necessary electricity with a turbine generator." The estimated cost of the new equipment recommended for that purpose was $60,000 to $65,100 plus an installation cost of between $15,000 and $20,000. The letter concludes, "We submit the above suggestions for your *14 consideration and would be very glad to co-operate in any way toward the setting up of a definite program." John F. Boyle, Jr. had discussions with General Electric Co. since 1935, regarding the subject of the letter, and though approached by them several times "to see whether he was ready to go along with the final figures", no contract with them had been executed up to the date of the hearing. When the new boiler house in which the turbine generator is to be installed is completed, "serious consideration" will be given to the installation of the turbine generator. The income tax returns filed by John F. Boyle, Jr. for the calendar years 1938 and 1939 show the following: 1938
1939
Total income
$28,733.21
$42,461.71
Net income
27,553.21
40,258.71
Surtax net income
24,253.21
36,958.71
Income subject to nor-
mal tax
22,853.21
35,558.71
The earnings or profits of petitioner were permitted to accumulate beyond the reasonable needs of its business in the taxable years 1938 and 1939 and during those years petitioner was availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its earnings or profits *15 to accumulate instead of being divided or distributed. Opinion TYSON, Judge: There is no contention by respondent that petitioner was formed for the purpose of preventing the imposition of the surtax upon its sole shareholder. The sole issue is whether petitioner was availed of during the years 1938 and 1939 for the purpose of preventing the imposition of the surtax upon its sole shareholder through the medium of permitting earnings or profits to accumulate instead of being divided or distributed. The applicable statutes are sections 102 (a) and (c) of the Revenue Act of 1938, and of the Internal Revenue Code. [1]
*16 Under section 102 (c), supra, accumulation of earnings or profits beyond the reasonable needs of the business is determinative of a purpose to avoid the surtax unless the clear preponderance of the evidence is to the contrary. Petitioner asserts in its petition that its earnings "for the years 1938 and 1939 were retained solely for business needs of petitioner for the modernization and improvement of its plant, machinery, equipment, and boiler house facilities." Its argument is based on the same proposition. It denies any purpose of preventing imposition of surtax on its shareholder. As of December 31, 1937 and December 31, 1938 petitioner's accounts payable amounted to $30,513.79 and $25,381.66, respectively; and, on the same dates, "taxes payable" by petitioner were $21,949.46 and $18,340.37, respectively. On those dates, there were no further liabilities of petitioner, except $240.83 "accrued expenses on December 31, 1937". There is no suggestion that the accumulation of earnings and prots was needed to meet any of the above enumerated liabilities of petitioner; the sole contention of the petitioner being that there was a reasonable need of its business for the accumulation *17 of its earnings and profits in 1938 and 1939 for the purpose of modernizing and improving its plant, machinery, and equipment. Petitioner was organized in 1909. With a capital of but $125,000 during the years 1933 and thereafter, its earned surplus was $827,927.22 in 1933 and, through steady annual increases, had grown to $1,145,764.35 in 1937 and to $1,433,269.93 in 1941. In the years 1938 and 1939 the book surplus dropped to $781,219.17 and $832,798.96, respectively, partly through transfer from the surplus account to a reserve account for losses and bad debts of the amount of $412,282.11, representing the total indebtedness to petitioner of the estate of John F. Boyle, Sr. and the Central Storage and Realty Company, which amount was thereafter restored to surplus account, and so remained. The $412,282.11 constituted part of the real surplus for the years 1938 and 1939, since the evidence does not justify the setting up of such reserve in those years, as is confirmed by its restoration to surplus in 1940. Petitioner's cash on hand had increased steadily, with the exception of 1936, from $93,620.28 in 1933, to $337,524.89 in 1937, to $399,620.41 in 1938, to $457,195.38 in 1939, *18 to $500,045.03 in 1940, and to $502,774.28 in 1941. In 1938 and 1939 petitioner owned stock in corporations engaged in unrelated activities with a market value of $94,706.75 in 1938 and $101,419.75 in 1939. In 1938 and 1939 petitioner had outstanding accounts and bills receivable in the respective amounts of $75,058.62 and $117,674.52, all of which were readily collectible. It thus appears that petitioner in 1938 and 1939 had quick assets consisting of cash, marketable securities, and readily collectible accounts in the respective amounts of $569,385.78 and $676,289.65 with which to meet its business requirements; and this without reference to the indebtedness of the estate of John F. Boyle, Sr. in the amount of $209,482.11 and the indebtedness of the Central Storage and Realty Company in the amount of $202,800, neither of which two last mentioned items is shown to have been uncollectible in the taxable years. We think the position of petitioner in the taxable years 1938 and 1939 as regards its quick assets when considered in connection with other established facts clearly demonstrates that its earnings and profits for those years were permitted to accumulate beyond the reasonable *19 needs of its business and that during those years, there being no clear preponderance of evidence to the contrary, petitioner was availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its earnings and profits to accumulate instead of being divided or distributed, and we so hold. Cf. United Block Co. v. Helvering, 123 F.2d 704. Our holding is substantiated when another view is taken of the situation. For a period of nine years, from 1934 to 1942, inclusive, petitioner had expended an average of approximately $42,283 per annum for additions to and improvements on its plant, machinery, and equipment, and during those years the production of petitioner had increased from 14,338 tons in 1934 to 28,857 tons in 1941, and to 24,052 tons in 1942, while its sales in dollar values had increased from $516,650.51 in 1934 to $1,219,327.57 in 1941 and $992,769.16 in 1942. In the eight year period, 1934 to 1941, the average annual increase in surplus of the petitioner was more than one and one-half times the average annual expenditures of petitioner during that period for improvements on its *20 building, equipment, and machinery. It is thus apparent that in each year when petitioner made improvements it realized enough profits out of its business to pay for such improvements and to have a large percentage of its profits left on hand. With the additions and improvements made the petitioner had a steadily increasing business, both in volume of production and in value of such volume and had obviously successfully conducted its business against competition. In view of the facts recited in this paragraph it would impose on credulity to believe that the large accumulation of earnings and profits retained and not distributed in 1938 and 1939 was justified by a reasonable need of petitioner's business. In further confirmation of our conclusion that petitioner's earnings and profits were permitted to accumulate beyond the reasonable needs of its business are the facts that petitioner had invested $184,126.50 in securities of corporations unrelated to and forming no part of its normal business; that it had loaned the father of its sole shareholder $209,482.11 which, although not shown to have been uncollectible, remained uncollected against the father's estate after the lapse of *21 nine years; and that it had an outstanding loan of $202,800 made to the Central Storage and Realty Company, of which petitioner's sole shareholder is president, and all of the stock of which is owned by the estate of his father. The petitioner has thus diverted over $596,000 from its normal business purposes - more than six times the earnings and profits retained in either of the taxable years. Our statement in Whitney Chain & Mfg. Co., 3 T.C. 1109, 1118 (on appeal C.C.A. 2d Cir. [1]) is applicable: * * * While it is true that these diversions originated in past years, and for the most part while the corporation was under the control of its late president, C. E. Whitney, it is equally true that the funds continued to constitute part of the petitioner's accumulated earnings or profits, against the unreasonableness of which the statutory presumption is directed. We are of the opinion that, to the extent the assets served no useful purpose as far as petitioner's own business is concerned, the accumulated earnings must be held to have been beyond the reasonable needs of the business in 1939. *22 John F. Boyle, Jr., petitioner's shareholder and executive head, attempted to justify petitioner's retention of its earnings and profits and its large accumulations in the taxable years as being requisite for the completion of a plan of contemplated improvement and modernization of petitioner's plant. He testified that when he took charge in 1929 he found that it would be necessary to modernize the plant and that he then planned to do so. In an affidavit given respondent in 1935 in connection with the proposed issuance of a deficiency notice for the year 1933 which was based on the same grounds as is the deficiency notice here, Boyle stated that throughout 1933 and in 1935 he had a definite plan to modernize the plant at a cost of about $800,000. At the date of the hearing, December 1943, he estimated the cost of the improvements yet to be made at about $500,000. In as much as through a period ending with 1942 approximately $380,000 had been expended by petitioner on improving its plant and equipment and no further amount is shown so to have been expended in 1943 it is apparent that the plan of petitioner for its plant improvement, if any, was practically the same from 1929 to and *23 including 1943 and yet after this period of 14 years had elapsed the expenditures contemplated by the plan had not been made to the extent of $500,000. In explanation of the slow progress made, Boyle stated the modernization program was necessarily a slow step by step development due to petitioner's limited ground space and to avoid interruption in its operations. Under the circumstances recited in this paragraph we can not conclude that such plan was intended to be carried out at such pace or to such extent as to require the retention in 1938 and 1939 of the large amounts of petitioner's earnings and profits accumulated in those years. Cf. J. M. Perry & Co. v. Commissioner, 120 F.2d 123; Wilson Bros. & Co. v. Commissioner, 124 F.2d 606; Wilkerson Daily Corporation, Ltd., 42 B.T.A. 1266, 1273; affd., 125 F.2d 998. Moreover, assuming that in 1938 and 1939 petitioner actually contemplated carrying out such plan step by step as testified to by Boyle, it is evident from the record as to the actual development of the plan in the five year period, 1938 *24 to 1942, inclusive, that petitioner could have easily met the financial demands thereof, out of cash on hand alone, even though it had disbursed in dividends its total net income of $95,432.24 in 1938 and $64,145.73 in 1939. Assuming such dividends had in fact been so disbursed, petitioner's cash on hand and true surplus adjusted to show such dividend payments would in the five year period have shown the following relation to the disbursements actually made on buildings, machinery, and equipment: Expenditures on
Year
Mach. &
Dec. 31.
Cash
Surplus
Buildings
Equip.
1937
337,524.89
1,145,764.35
20,006.91
1938
304,188.17
1,098,073.04
20,550.06
1939
297,617.41
1,085,407.10
885.50
4,632.62
1940
340,467.06
1,139,184.66
8,235.22
23,736.54
1941
343,196.31
1,273,691.96
15,368.16
107,550.42
1942
7,774.35
459.82
It is thus apparent that even after payment of the entire 1938 and 1939 net income as dividends and after payment of expenditures actually made for buildings, machinery, and equipment in those and ensuing years, petitioner's cash on hand would still be far in excess of the indicated requirements of its business. Also, it *25 may be said that if the contemplated improvements were planned to have been made and the cost thereof would be as stated by John F. Boyle, Jr., the earnings and profits of the taxable years could have been distributed and the plan effectuated, if for no other reason than that Boyle as sole shareholder of petitioner, except for qualifying shares, would have received all such distribution and could have protected petitioner against the cost of such improvements equally as well as petitioner could have been protected by the retention of such earnings or profits for such purpose. Cf. Helvering v. National Grocery Co., 304 U.S. 282, 82 L. Ed. 1346, 58 S. Ct. 932; and Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 87 L. Ed. 1086, 63 S. Ct. 843. Decision will be entered under Rule 50. Footnotes
1. Revenue Act of 1938. SEC. 102. Surtax on Corporations Improperly Accumulating Surplus. (a) Imposition of Tax. - There shall be levied, collected, and paid for each taxable year * * * upon the net income of every corporation * * * if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following: 25 per centum of the amount of the undistributed section 102 net income not in excess of $100,000 plus 35 per centum of the undistributed section 102 net income in excess of $100,000. * * * * *
(c) Evidence Determinative of Purpose. - The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary. (Sections 102 (a) and (c) of the Internal Revenue Code↩ are substantially the same as the foregoing.)
1. Tax Court affirmed, 149 F.2d 936↩.