The **HARRY A. KOCH CO.**, Plaintiff,

v.

**Richard P. VINAL**, Defendant.

**Civ. No. 01426.**

United States District Court
D. Nebraska.

April 9, 1964.

Harry Welch and William A. Day, Jr., Omaha, Neb., for plaintiff.

Howard Singer, Tax Division, Department of Justice, Washington, D. C., for defendant.

ROBINSON, Chief Judge.

This action was instituted by the Harry A. Koch Co. to recover money collected by the defendant District Director of Internal Revenue as accumulated earnings, taxes and interest for the years 1958 and 1959.

The Taxpayer is a Nebraska corporation with a majority of its stock owned by Harry A. Koch, Sr. and Harry A. Koch, Jr. Part of the stock is owned by certain key employees and others on a stock re-purchase agreement whereby the corporation will re-purchase the stock if the employee dies, leaves the corporation's employment, or wishes to sell the stock. This seems to be an effort to maintain the basic integrity of the company. The Harry A. Koch Co. is engaged as an insurance broker specializing in contractors, public liability and indemnity bond insurance. For the sake of convenience, further reference to the Harry A. Koch Co. will be by the terms "company" or "Taxpayer".

The controversy herein arose after an audit in 1961 by the Commissioner of Internal Revenue. In 1958 the Taxpayer had an income before taxes of $28,831.44. After taxes and a dividend distribution of $15,000, $10,530.60 remained and was accumulated as part of the Taxpayer's earned surplus account. In 1959 there was an income before taxes of $39,990.89 which resulted in a further accumulation of earned surplus in the amount of $16,-616.51, after taxes and a dividend distribution of $14,000. The Commissioner determined that such accumulation for these years was unreasonable in relation to the business needs of the company under §§ 532 and 533 of the Internal Revenue Code of 1954, 26 U.S.C. §§ 532 and 533 and therefore he imposed the surtax on accumulated earnings under § 531 of the Code, 26 U.S.C. § 531.

§§ 531 and 532 provide that whenever a corporation is availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed, such earnings will be subject to an accumulated earnings tax for the taxable year. § 532 of the Code states that the accumulation of earnings and profits beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to the shareholders unless the corporation shall be able to prove otherwise.

It is the Taxpayer's contention and the burden in fact rests upon it to prove that [1] these accumulations were not beyond the reasonable needs of the business, and/or [2] that the purpose in

784

so accumulating the earnings was not to avoid the income tax with respect to shareholders.

The main question to be resolved, then, is whether the Commissioner in fact erred when he determined that these accumulations were beyond the reasonable needs of the business. In order to reach a conclusion, we will examine each of the Taxpayer's primary contentions and make a finding as to the facts disputed.

A proper analysis of the reasonable needs of the business in relation to surplus demands an initial determination of the amount of money actually available to the company by way of assets and surplus through which it could conduct its business. The Taxpayer contends that the stocks, bonds, and other securities which make up the greater part of the assets to be considered as surplus should be figured at a cost value, while the Government feels that it is more realistic to use the market value. The Taxpayer also contends that it deserves a $100,000 credit as per § 535 [c] of the Code, 26 U.S.C., 1958 ed., § 535. The Government contends that a $50,000 stock dividend declared in 1954 should be added to surplus for our purposes. The net result of the calculations of the opposing parties is two widely divergent amounts being pressed upon this Court for our use in the determination of this case. If we follow the Taxpayer's suggestions, the surplus to be considered would be approximately $118,000 for 1958, and $127,000 for 1959. The Government's figures for the same two years are approximately $590,000 and $610,000, respectively.

It is our opinion that the Taxpayer is correct in asserting that the cost of securities to the company is the proper figure to be used for tax purposes.

■ We agree whole-heartedly with the Government when it says that the practical rather than the theoretical figures should be the determining factors in arriving at a conclusion on surplus for the purposes of this surtax. We also comply with the Government's thought that the market value should be used

when the value of the securities have dipped below the amount paid for them by the purchaser. In that case, practicability forces us to say that such securities will not yield the full amount paid for them if they are sold and thus the purchaser does not have the cost value of the securities available to meet the reasonable needs of his business. This, however, is as far as we are able to go. It does not follow that since the securities have increased in value the Taxpayer should recognize this and consider that this increased value is available to use in his business. Considering the flexible qualities of the securities market and the 25% tax [at least] which would be levied by the Government on such appreciation, it is unrealistic to blandly state that the Taxpayer can reasonably expect to use this appreciation in the ordinary course of its business. Accounting men have recognized this principle for years and have refused to value securities at their market value in the balance sheets for these very reasons. The Government is wrong in contending that the securities owned by the Taxpayer should be valued at a market rather than a cost figure.

■ We are of the opinion that the $100,000 credit claimed by the Taxpayer under § 535 [c] of the Code, supra is improper. This section does allow such a credit, but only when the surplus of the company claiming the credit is less than $100,000. 7 Mertens, Law of Federal Income Taxation [Rev.], § 39.25. The lowest figure which the Taxpayer itself claims as surplus is much higher than $100,000. This credit cannot be allowed by this Court in its determination.

■ The Company transferred $50,-000 from its surplus account to its capital account in 1954 as a stock dividend. The Government contends that this money, although technically a part of capital, still remains available for use as surplus, the transfer being a mere convention for the purposes of the stock dividend. We agree that this money is still available to the Company for its use, but it would be inconsistent to allow it to be used as part of

surplus for this case. We are attempting to decide whether or not the Taxpayer was unreasonable in not distributing more of its earnings by dividend, thereby showing an intent to avoid further payment of taxes by the stockholders. Under § 21–175, R.R.S.Neb.1943, which was in effect during 1958 and 1959 [it was repealed during the last session of the Nebraska Legislature in favor of the Model Business Corporation Act] dividends may be paid only out of those assets which are in excess of capital or from profits. § 21–130, R.R.S.Neb. 1943 provides that capital may be increased by transferring a portion of the net assets in excess of the amount determined to be capital to the capital account. Thus, the money which was transferred to the capital account by the stock dividend is not available for the distribution of dividends. On the one hand we are asked to include this money in the amount of surplus available to meet the needs of the business so as to determine that the Taxpayer was not reasonable in refusing to distribute more dividends while on the other hand we are forced to say, by statute, that this money is not available for distribution by dividend. To be consistent and fair, it is our opinion that this money should not be included as part of the surplus account for purposes of determining the applicability of this surtax.

Therefore, we have concluded that for the purposes of this case, the surplus figures to be used will be approximately $220,000 for 1958 and $230,000 in 1959. We may now turn to the claims of the Taxpayer as to the reasonable needs of its business.

The Company contends that due to the nature of its business, it is possible that it may become responsible for a large loss incurred by one of its clients either through an error or omission of its own in failing to renew or properly place an insurance policy with an insurance company or through the failure by bankruptcy or the like of one of the insurance companies with which the company places its policies. Incidents were cited by the officers of the Taxpayer during which the Taxpayer was open to such excessive liability for a period of a week or longer.

In 1961, the Company purchased insurance coverage which protected it against its own errors and omissions in the amount of $250,000. The policy, which contains a $25,000 deductible clause, cost only $167.00 per year. This would indicate that the insurance company did not consider itself in any great danger of incurring a large loss from a claim by the Taxpayer. Nonetheless, the fact that the Taxpayer's choice to insure itself against such possibilities was imprudent does not mean that it was unreasonable. To say that would be to place the Government's business judgment in the place of the Taxpayer's which cannot be allowed, especially in retrospect such as would be the case here.

It is interesting to note that Marsh & McLennan, a firm engaged in the same type of business as the Taxpayer, but on a much larger scale, deems it necessary to maintain a ratio of current assets to current liabilities of about 3 to 1, while that of the Taxpayer is somewhere in the neighborhood of 2 to 1. We believe that the current ratio is highly indicative of the financial position of a company in relation to its business needs. Comparison with the ratio of a respectible firm engaged in the same type of business is a quite effective method of determining what is a reasonable ratio for the kind of business with which we are dealing. It must be noted, however, that such comparison should only be made under circumstances such as those existing here, i. e. the type of business and methods of conducting the business must be quite similar to make a comparison effective.

The Taxpayer also contends that during 1958 and 1959 plans had developed or were developing to construct a building to house the business. It became apparent in 1956 and 1957 that the lessor of the building used by the Taxpayer was going to be in need of the Taxpayer's premises for the lessor's own business after the present lease expires in 1966. This was definitely confirmed when the lessor told

the Taxpayer in 1959 that the lease would not be renewed. It is our opinion that the Taxpayer had definite plans to construct its own building subsequent to the expiration of the lease, and that these plans were being entertained during 1958 and 1959. Aside from the knowledge that the lessor would not renew the lease, it seems to be the trend in business today for companies to build offices for their own use when such endeavors become financially possible and profitable. We believe that the Taxpayer here is no exception and that it has sufficiently shown that it had plans to construct new offices and that such plan existed during 1958 and 1959. It is estimated that such a building would cost about $200,000. This in itself would make the retention of surplus funds reasonable.

■ It is the manifest intention of the Taxpayer at the time of the accumulation which is important and must be considered. The fact that land was purchased in 1961 and a special building fund was not started until 1962 have no effect on the purpose at the time of the accumulation in question. As we said above, it is our opinion that the Taxpayer manifested an intention during 1958 and 1959 to construct a new office building in the future.

The Government in its brief predicts that the Taxpayer will finance any such building by a mortgage or some such other financial arrangement. Once more the Government is attempting to replace the business judgment of the Taxpayer with its own. We repeat that this cannot and will not be allowed. The Government is in no position to dictate to the management of a company the means which shall be used to run such company. We hope never to see the day when our system of free enterprise is so fettered by Government intervention.

There are two final points which we will consider. Although they are minor in nature and certainly not determinative of the issues in view of the findings made above, we feel compelled to discuss them since counsel for both parties mentioned them in their briefs.

The Taxpayer contends that $35,000 worth of accounts receivable which are three months overdue must constantly be carried on the books and this is one more reason that a large surplus must be maintained. The Government claims that since the Company's salesmen are held responsible for all premiums not paid by the clients, this $35,000 is more of a fabrication than reality. However, we believe that a practical analysis of this account substantiates the contentions of the Taxpayer. This $35,000 is constantly on the books and represents a sum which has been expended by the Company for which it has not yet been paid. In practicality, this sum must always be advanced and is not available for the other needs of the business. In order to maintain good will with its employees and its clients, this sum will remain constant. This is a practical matter that we believe should be obvious on its face.

The Government feels that certain life insurance policies on key employees are the company's way of providing for its obligation on the stock re-purchase agreement. This is stretching a point a long ways to make a rather tenuous inference in our opinion. Certain of the stockholders are not officers in the company and are therefore not insured by the company. Nevertheless, the Government contends that the cash surrender value of these policies can be used to make any and all purchases of stock that are necessary under the plan. This, of course, completely overlooks the main purpose of such policies which is to protect the company from undue expense arising from loss of time in finding and training capable replacements in the event of the untimely loss of one of the company's key employees. If the Government had seriously meant to introduce such a thought before this Court, it would have been a simple matter to more fully expound this theory during the course of the trial. The failure to do so indicates to us the importance which the Government assigns to this theory.

■ We believe that the Taxpayer in this case was within the bounds of rea-

son in the accumulation of its surplus to meet its business needs. Therefore, we conclude that the imposition of the surtax complained of in this action was improper and should be returned to the Taxpayer together with any and all interest allowed by law.

The foregoing shall constitute the Court's findings of fact and conclusions of law under Rule 52, Federal Rules of Civil Procedure. Judgment will be in favor of the plaintiff, granting the relief requested in its Complaint. Counsel for the plaintiff will prepare and submit a form of judgment within fifteen (15) days.