## IVAN ALLEN CO. *v.* UNITED STATES

No. 74–22.   Argued April 14–15, 1975—Decided June 26, 1975

*Kirk McAlpin* argued the cause for petitioner.   With him on the briefs were *Herschel M. Bloom* and *Michael C. Russ.*

*Assistant Attorney General Crampton* argued the cause for the United States.   With him on the brief were *Solicitor General Bork, Stuart A. Smith,* and *Elmer J. Kelsey.**

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

Sections 531–537, inclusive, of the Internal Revenue Code of 1954, as amended, 26 U. S. C. §§ 531–537, con-

---

*\*Carolyn E. Agger, Walter J. Rockler,* and *John S. McDaniel, Jr.,* filed a brief for American Trading and Production Corp. as *amicus curiae.*

stitute Part I of subchapter G of the Income Tax Subtitle. These sections subject most corporations to an "accumulated earnings tax." Section 531 [1] imposes the tax upon the "accumulated taxable income" of every corporation that, as § 532 (a) states,[2] is "formed or availed of for the purpose of avoiding the income tax with respect to its shareholders . . . by permitting earnings and profits to accumulate instead of being divided or distributed." And § 533 (a) [3] provides that "the fact that the earnings and profits . . . are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation

---

[1] "§ 531. Imposition of accumulated earnings tax.

"In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of—

"(1) 27½ percent of the accumulated taxable income not in excess of $100,000, plus

"(2) 38½ percent of the accumulated taxable income in excess of $100,000."

[2] "§ 532. Corporations subject to accumulated earnings tax.

"(a) General rule.

"The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed."

[3] "§ 533. Evidence of purpose to avoid income tax.

"(a) Unreasonable accumulation determinative of purpose.

"For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary."

by the preponderance of the evidence shall prove to the contrary." [4]

The issue here is whether, in determining the application of § 533 (a), listed and readily marketable securities owned by the corporation and purchased out of its earnings and profits, are to be taken into account at their cost to the corporation or at their net liquidation value, that is, fair market value less the expenses of, and taxes resulting from, their conversion into cash.

## I

The pertinent facts are admitted by the pleadings or are stipulated:

The petitioner, Ivan Allen Company (the taxpayer), is a Georgia corporation incorporated in 1902 and actively engaged in the business of selling office furniture, equipment, and supplies in the metropolitan Atlanta area. It files its federal income tax returns on the accrual basis and for the fiscal year ended June 30.

For its fiscal years 1965 and 1966, the taxpayer paid in due course the federal corporation income taxes shown on its returns as filed. Taxable income so reported was $341,045.82 for 1965 and $629,512.19 for 1966. App. 59, 84. During fiscal 1965 the taxpayer paid dividends consisting of cash in the amount of $48,945.30 and 870 shares

---

[4] In a proceeding before the United States Tax Court, § 534 allows the taxpayer to shift the burden of proof to the Commissioner of Internal Revenue. Section 535 defines "accumulated taxable income" to mean the corporation's taxable income adjusted as specified; a credit is given for "such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business," with a minimum "lifetime" credit of $100,000 ($150,000 for taxable years beginning after December 31, 1974, Pub. L. 94–12, § 304, 89 Stat. 45, 26 U. S. C. § 535 (c) (2) (1970 ed., Supp. IV). Finally, § 537 provides that the term "reasonable needs of the business" includes "the reasonably anticipated needs of the business."

of Xerox Corporation common that had been carried on its books at a cost of $6,564.34. During fiscal 1966 the taxpayer paid cash dividends of $50,267.49; it also declared a 10% stock dividend. *Id.*, at 56. The dividends paid were substantially less than taxable income less federal income taxes for those years.

Throughout fiscal 1965 and 1966, the taxpayer owned various listed and unlisted marketable securities. Prominent among these were listed shares of common stock and listed convertible debentures of Xerox Corporation that, in prior years, had been purchased out of earnings and profits. Specifically, on June 30, 1965, the corporation owned 11,140 shares of Xerox common, with a cost of $116,701 and a then fair market value of $1,573,525, and $30,600 Xerox convertible debentures, with a cost to it of $30,625 and a then fair market value of $48,424. On June 30, 1966, the corporation owned 10,090 shares of Xerox common, with a cost of $102,479 and a then fair market value of $2,479,617, and the same $30,600 convertible debentures, with their cost of $30,625 and a then fair market value of $69,768. *Id.*, at 55.

According to its returns as filed, the taxpayer's undistributed earnings as of June 30, 1965, and June 30, 1966, were $2,200,184.77 and $2,360,146.52, respectively. *Id.*, at 70, 91. The taxpayer points out that the marketable portfolio assets represented an investment, as measured by cost, of less than 7% of its undistributed earnings and of less than 5% of its total assets. Brief for Petitioner 4.

It is also apparent, however, that the Xerox debentures and common shares had proved to be an extraordinarily profitable investment, although, of course, because these securities continued to be retained, the gains thereon were unrealized for federal income tax purposes. The debentures had increased in fair market value more than 50% over cost by the end of June 1965,

and more than 100% over cost one year later; the common shares had increased in fair market value more than 13 times their cost by June 30, 1965, and more than 24 times their cost by June 30, 1966.

Throughout fiscal 1965 and 1966 the taxpayer's two major shareholders, Ivan Allen, Sr., and Ivan Allen, Jr., respectively owned 31.20% and 45.46% of the taxpayer's outstanding voting stock. App. 78, 104.

Following an examination of the taxpayer's federal income tax returns for fiscal 1965 and 1966, the Commissioner of Internal Revenue determined that the taxpayer had permitted its earnings and profits for each of those years to accumulate beyond the reasonable and reasonably anticipated needs of its business, and that one of the purposes of the accumulation for each year was to avoid income tax with respect to its shareholders. Based upon this determination, the Commissioner assessed against the corporation accumulated earnings taxes of $77,383.98 and $73,131.87 for 1965 and 1966, respectively.

The taxpayer paid these taxes and thereafter timely filed claims for refund. The claims were not allowed, and the taxpayer then instituted this refund suit in the United States District Court for the Northern District of Georgia.

It is agreed that the taxpayer had reasonable business needs for operating capital amounting to $1,198,309 and $1,455,222 at the close of fiscal 1965 and fiscal 1966, respectively. *Id.,* at 56. It is stipulated, in particular, that if the taxpayer's marketable securities are to be taken into account at *cost,* its net liquid assets (current assets less current liabilities), at the end of each of those taxable years, and fully available for use in its business, were then exactly equal to its reasonable business needs for operating capital, that is, the above-stated figures of $1,198,309 and $1,455,222. It would follow, accordingly,

that the earnings and profits of the two taxable years had *not* been permitted to accumulate beyond the taxpayer's reasonable and reasonably anticipated business needs, within the meaning of § 533 (a), App. 57, and no accumulated earnings taxes were incurred. It is still further stipulated, however, that if the taxpayer's marketable securities are to be taken into account at *fair market value* (less the cost of converting them into cash), as of the ends of those fiscal years,[5] the taxpayer's net liquid assets would then be $2,235,029 and $3,152,009, respectively. *Id.,* at 56. From this it would follow that the earnings and profits of the two taxable years *had* been permitted to accumulate beyond the taxpayer's reasonable and reasonably anticipated business needs. Then, if those accumulations had been for "the purpose of avoiding the income tax with respect to its shareholders," under § 532 (a), accumulated earnings taxes would be incurred.

The issue, therefore, is clear and precise: whether, for purposes of applying § 533 (a), the taxpayer's readily marketable securities should be taken into account at cost, as the taxpayer contends, or at net liquidation value, as the Government contends.

The District Court held that the taxpayer's readily marketable securities were to be taken into account at cost. Accordingly, it entered judgment for the petitioner-taxpayer. 349 F. Supp. 1075 (1972). The court observed:

"Corporate taxpayers should not be penalized for

---

[5] It is stipulated that the cost of converting the taxpayer's marketable securities into cash would have been the sum of a maximum of 6% of the fair market value of the securities (payable as a brokerage commission) and a maximum of 25% of such amount of the fair market value as exceeds the sum of the brokerage commission and the cost of the securities (payable as capital gains taxes). App. 55.

wise investments; they should be allowed to maximize their capital gains tax advantages in accordance with internal business policies and stock market conditions rather than being forced to sell securities which may have a high value on an arbitrarily selected date merely because the unrealized fair market value of the securities on that date would trigger the accumulated earnings tax." *Id.,* at 1077. (Footnote omitted.)

The United States Court of Appeals for the Fifth Circuit reversed. 493 F. 2d 426 (1974). It observed:

"[T]he securities involved in the case at bar are of such a highly liquid character as to be readily available for business needs that might arise. Thus the appreciated value of these securities should be taken into account when determining whether the corporation has accumulated profits in excess of reasonable business needs.

.        .        .        .        .

"This decision does not force the corporation to liquidate these securities at any time when a sale would be financially unwise, but only compels the corporation to comply with the proscriptions of the Code and refrain from accumulating excessive earnings and profits." *Id.,* at 428.

The case was remanded, as the parties had agreed, App. 57–58, "for the additional factual determination [under § 532 (a)] of whether one purpose for the accumulation was to avoid income tax on behalf of the shareholders." 493 F. 2d, at 428.

Because this conclusion was claimed by the taxpayer to conflict in principle with *American Trading & Production Corp.* v. *United States,* 362 F. Supp. 801 (Md. 1972), aff'd without published opinion, 474 F. 2d 1341 (CA4

1973),[6] and because of the importance of the issue in the administration of the accumulated earnings tax, we granted certiorari. 419 U. S. 1067 (1974).

## II

Under our system of income taxation, corporate earnings are subject to tax at two levels. First, there is the tax imposed upon the income of the corporation. Second, when the corporation, by way of a dividend, distributes its earnings to its shareholders, the distribution is subject to the tax imposed upon the income of the shareholders. Because of the disparity between the corporate tax rates and the higher gradations of the rates on individuals,[7] a corporation may be utilized to reduce significantly its shareholders' overall tax liability by accumulating earnings beyond the reasonable needs of the business. Without some method to force the distribution of unneeded corporate earnings, a controlling shareholder would be able to postpone the full impact of income taxes on his share of the corporation's earnings in excess of its needs. See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 8.01 (3d ed. 1971); B. Wolfman, Federal Income Taxation of Business Enterprise 864 (1971).

In order to foreclose this possibility of using the corporation as a means of avoiding the income tax on dividends to the shareholders, every Revenue Act since the adoption of the Sixteenth Amendment in 1913 has imposed a tax

---

[6] American Trading and Production Corporation, pursuant to our Rule 42, was granted permission to file a brief as *amicus curiae* in the present case. It asserts that no conflict exists between the decisions in this case and in its own case.

[7] The income tax rates for a corporation are 22% of the first $25,000 of taxable income and 48% of the excess over $25,000. § 11 of the 1954 Code, 26 U. S. C. § 11. The graduated rates for an individual taxpayer range from 14% to 70%. § 1, 26 U. S. C. § 1.

upon unnecessary accumulations of corporate earnings effected for the purpose of insulating shareholders.[8]

The Court has acknowledged the obvious purpose of the accumulation provisions of the successive Acts:

"As the theory of the revenue acts has been to tax corporate profits to the corporation, and their receipt

---

[8] The accumulated earnings tax originated in § II A, Subdivision 2, of the Tariff Act of October 3, 1913, 38 Stat. 166. This imposed a tax on the shareholders of a corporation "formed or fraudulently availed of for the purpose of preventing the imposition of such tax through the medium of permitting such gains and profits to accumulate instead of being divided or distributed." Accumulations "beyond the reasonable needs of the business shall be prima facie evidence of a fraudulent purpose to escape such tax." *Id.*, at 167. The same provision appeared as § 3 of the Revenue Act of 1916, 39 Stat. 758, and again as § 220 of the Revenue Act of 1918, 40 Stat. 1072 (1919), except that in the 1918 Act the word "fraudulently" was deleted. This change was effected inasmuch as the Senate felt that the former phraseology "has proved to be of little value, because it was necessary to its application that intended fraud on the revenue be established in each case." S. Rep. No. 617, 65th Cong., 3d Sess., 5 (1918).

This pattern of tax on the shareholders was changed with the Revenue Act of 1921, § 220, 42 Stat. 247. The incidence of the tax was shifted from the shareholders to the corporation itself. Judge Learned Hand opined that the change was due to doubts "as to the validity of taxing income which the taxpayers had never received, and in 1921 it was thought safer to tax the company itself." *United Business Corp.* v. *Commissioner*, 62 F. 2d 754, 756 (CA2), cert. denied, 290 U. S. 635 (1933).

Although the statutory language has varied somewhat from time to time, the income tax law, since the change effected by the Revenue Act of 1921, consistently has imposed the tax on the corporation, rather than upon the shareholders. Revenue Act of 1924, § 220, 43 Stat. 277; Revenue Act of 1926, § 220, 44 Stat. 34; Revenue Act of 1928, § 104, 45 Stat. 814; Revenue Act of 1932, § 104, 47 Stat. 195; Revenue Act of 1934, § 102, 48 Stat. 702; Revenue Act of 1936, § 102, 49 Stat. 1676; Revenue Act of 1938, § 102, 52 Stat. 483; Internal Revenue Code of 1939, § 102.

only when distributed to the stockholders, the purpose of the legislation is to compel the company to distribute any profits not needed for the conduct of its business so that, when so distributed, individual stockholders will become liable not only for normal but for surtax on the dividends received." *Helvering* v. *Chicago Stock Yards Co.*, 318 U. S. 693, 699 (1943).

This was reaffirmed in *United States* v. *Donruss Co.*, 393 U. S. 297, 303 (1969).

It is to be noted that the focus and impositions of the accumulated earnings tax are upon "accumulated taxable income," § 531. This is defined in § 535 (a) to mean the corporation's "taxable income," as adjusted. The adjustments consist of the various items described in § 535 (b), including federal income tax, the deduction for dividends paid, defined in § 561, and the accumulated earnings credit defined in § 535 (c). The adjustments prescribed by §§ 535 (a) and (b) are designed generally to assure that a corporation's "accumulated taxable income" reflects more accurately than "taxable income" the amount actually available to the corporation for business purposes. This explains the deductions for dividends paid and for federal income taxes; neither of these enters into the computation of taxable income. Obviously, dividends paid and federal income taxes deplete corporate resources and must be recognized if the corporation's economic condition is to be properly perceived. Conversely, § 535 (b)(3) disallows, for example, the deduction, available to a corporation for income tax purposes under § 243, on account of dividends received; dividends received are freely available for use in the corporation's business.

The purport of the accumulated earnings tax structure established by §§ 531–537, therefore, is to determine the

corporation's true economic condition before its liability for tax upon "accumulated taxable income" is determined. The tax, although a penalty and therefore to be strictly construed, *Commissioner* v. *Acker,* 361 U. S. 87, 91 (1959), is directed at economic reality.

It is important to emphasize that we are concerned here with a tax on "accumulated taxable income," § 531, and that the tax attaches only when a corporation has permitted "earnings and profits to accumulate instead of being divided or distributed," § 532 (a). What is essential is that there be "income" and "earnings and profits." This at once eliminates, from the measure of the tax itself, any unrealized appreciation in the value of the taxpayer's portfolio securities over cost, for any such unrealized appreciation does not enter into the computation of the corporation's "income" and "earnings and profits."

The corporation's readily marketable portfolio securities and their unrealized appreciation, nonetheless, are of profound importance in making the entirely discrete determination whether the corporation has permitted what, concededly, are earnings and profits to accumulate beyond its reasonable business needs. If the securities, as here, are readily available as liquid assets, then the recognized earnings and profits that have been accumulated may well have been unnecessarily accumulated, so far as the reasonable needs of the business are concerned. On the other hand, if those portfolio securities are not liquid and are not readily available for the needs of the business, the accumulation of earnings and profits may be viewed in a different light. Upon this analysis, not only is such accumulation as has taken place important, but the liquidity otherwise available to the corporation is highly significant. In any event—and we repeat—the tax is directed at the accumulated taxable income and

at earnings and profits. The tax itself is not directed at the unrealized appreciation of the liquid assets in the securities portfolio. The latter becomes important only in measuring reasonableness of accumulation of the earnings and profits that otherwise independently exist. What we look at, then, in order to determine its reasonableness or unreasonableness, in the light of the needs of the business, is any failure on the part of the corporation to distribute the earnings and profits it has.

Accumulation beyond the reasonable needs of the business, by the language of § 533 (a), is "determinative of the purpose" to avoid tax with respect to shareholders unless the corporation proves the contrary by a preponderance of the evidence. The burden of proof, thus, is on the taxpayer. A rebuttable presumption is statutorily imposed. To be sure, we deal here, in a sense, with a state of mind. But it has been said that the statute, without the support of the presumption, would "be practically unenforceable . . . ." *United Business Corp.* v. *Commissioner,* 62 F. 2d 754, 755 (CA2), cert. denied, 290 U. S. 635 (1933). What is required, then, is a comparison of accumulated earnings and profits with "the reasonable needs of the business." Business *needs* are critical. And need, plainly, to use mathematical terminology, is a function of a corporation's liquidity, that is, the amount of idle current assets at its disposal. The question, therefore, is not how much capital of all sorts, but how much in the way of quick or liquid assets, it is reasonable to keep on hand for the business. *United Block Co.* v. *Helvering,* 123 F. 2d 704, 705 (CA2 1941), cert. denied, 315 U. S. 812 (1942); *Smoot Sand & Gravel Corp.* v. *Commissioner,* 274 F. 2d 495, 501 (CA4), cert. denied, 362 U. S. 976 (1960) (liquid assets provide "a strong indication" of the purpose of the accumulation); *Electric Regulator*

*Corp.* v. *Commissioner,* 336 F. 2d 339, 344 (CA2 1964); *Novelart Mfg. Co.* v. *Commissioner,* 52 T. C. 794, 806 (1969), aff'd, 434 F. 2d 1011 (CA6 1970), cert. denied, 403 U. S. 918 (1971); *John P. Scripps Newspapers* v. *Commissioner,* 44 T. C. 453, 467 (1965).[9]

The taxpayer itself recognizes, and accepts, the liquidity concept as a basic factor, for it "has agreed that the full amount of its realized earnings invested in its liquid assets—their cost—should be taken into account in determining the applicability of Section 533 (a)." Brief for Petitioner 15. It concedes that if this were not so, "the tax could be avoided by any form of investment of earnings and profits." Reply Brief for Petitioner 5. But the taxpayer would stop at the point of cost and, when it does so, is compelled to compare earnings and profits—not the amount of readily available liquid assets, net—with reasonable business needs.

We disagree with the taxpayer and conclude that cost is not the stopping point; that the application of the accumulated earnings tax, in a given case, may well depend on whether the corporation has available readily marketable portfolio securities; and that the proper measure of those securities, for purposes of the tax, is their net realizable value. Cost of the marketable securities on the assets side of the corporation's balance sheet would appear to be largely an irrelevant gauge of the taxpayer's true financial condition.[10] Certainly, a

---

[9] In this case we are concerned only with readily marketable securities. We express no view with respect to items of a different kind, such as inventory or accounts receivable.

[10] "The tax should be administered with its purpose in mind at all times, *i. e.,* to prevent accumulations of income by the corporation for the purpose of avoiding the income tax ordinarily incident to the shareholders. It is not intended to serve as an obstacle to sound profit-oriented corporate management. The ultimate goal

lender would not evaluate a potential borrower's marketable securities at cost. Realistic financial condition is the focus of the lender's inquiry. It also must be the focus of the Commissioner's inquiry in determining the applicability of the accumulated earnings tax.[11]

This taxpayer's securities, being liquid and readily marketable, clearly were available for the business needs of the corporation, and their fair market value, net, was such that, according to the stipulation, the taxpayer's undistributed earnings and profits for the two fiscal years in question were permitted to accumulate beyond the reasonable and reasonably anticipated needs of the business.

### III

Bearing directly upon the issue before us is *Helvering* v. *National Grocery Co.*, 304 U. S. 282 (1938). There the fact situation was the reverse of the present case inasmuch as that taxpayer corporation had unrealized *losses* in the value of marketable securities it was continuing to hold. After the Court upheld the accumulated earnings tax against constitutional attack, *id.*, at

---

must be to administer the tax fairly, in light of the *total* economic reality of the corporation. Valuing liquid assets at cost invariably produces a poor and inaccurate picture of the corporate financial position. Adjusted fair market value may have shortcomings of its own, but it does, undeniably, come much closer to furthering the intent of the accumulated earnings tax." Note, Accumulated Earnings Tax: Should Marketable Securities be Valued at Cost or at Fair Market Value in Determining the Reasonableness of Further Accumulations of Income?, 40 Brooklyn L. Rev. 192, 209–210 (1973).

[11] We see little force in any observation that our emphasis on liquid assets means that a corporate taxpayer may avoid the accumulated earnings tax by merely investing in nonliquid assets. If such a step, in a given case, amounted to willful evasion of the accumulated earnings tax, it would be subject to criminal penalties. See, *e. g.*, § 7201 of the 1954 Code, 26 U. S. C. § 7201.

286–290, it observed: "Depreciation in any of the assets is evidence to be considered by the Commissioner and the Board [of Tax Appeals] in determining the issue of fact whether the accumulation of profits was in excess of the reasonable needs of the business." *Id.,* at 291. It went on to hold, however, that such depreciation "does not, as matter of law, preclude a finding that the accumulation of the year's profits was in excess of the reasonable needs of the business." *Ibid.* Indeed, the Court held that the evidence supported the Board's finding that the accumulation of surplus by the taxpayer was to enable its sole shareholder to escape surtaxes. It focused on bonds and stocks held by the corporation, described them as in no way related to the business, and concluded that "there was no need of accumulating any part of the year's earnings for the purpose of financing the business." *Id.,* at 291–292. That language forecloses the present taxpayer's case.

The precedent of *National Grocery* has been applied in accumulated earnings tax cases, with courts taking into account the fair market value of liquid, appreciated securities. *Battelstein Investment Co.* v. *United States,* 442 F. 2d 87, 89 (CA5 1971); *Cheyenne Newspapers, Inc.* v. *Commissioner,* 494 F. 2d 429, 434–435 (CA10 1974); *Henry Van Hummell, Inc.* v. *Commissioner,* 23 T. C. M. 1765, 1779 (1964), aff'd, 364 F. 2d 746 (CA10 1966), cert. denied, 386 U. S. 956 (1967); *Golconda Mining Corp.* v. *Commissioner,* 58 T. C. 139, supplemental opinion, 58 T. C. 736, 737–739 (1972), rev'd on other grounds, 507 F. 2d 594 (CA9 1974); *Ready Paving & Constr. Co.* v. *Commissioner,* 61 T. C. 826, 840–841 (1974). But see *Harry A. Koch Co.* v. *Vinal,* 228 F. Supp. 782, 784 (Neb. 1964).

*American Trading & Production Corp.* v. *United States,* 362 F. Supp. 801 (Md. 1972), aff'd without pub-

lished opinion, 474 F. 2d 1341 (CA4 1973), which the taxpayer continues to assert is in conflict with the present case, deserves mention. The taxpayer there had accumulated earnings and profits of something less than $10 million. Its anticipated business needs were about $12 million. But it owned stocks, primarily oil shares, having a total cost of $5,593,319 and an aggregate current market value in excess of $100 million. The District Court excluded these stocks in making its determination whether earnings had accumulated in excess of reasonable business needs. It did so on several grounds: that the shares constituted "original capital," a term the court used in the sense that the stocks "were properly held and retained as an integral part of [the taxpayer's] business and were utilized . . . as a base for borrowings for the needs of other parts of its business," 362 F. Supp., at 810; that the statute was not intended to require the conversion of assets of that kind into cash in order to meet business needs, even though that capital "has explosively increased in value," *id.*, at 808; and that "there was substantial evidence" that the stocks "were not readily saleable," *id.*, at 809.

Whatever may be the merit or demerit of the other grounds asserted by the District Court in *American Trading*—and we express no view thereon—we are satisfied that the court's determination as to the absence of ready salability, under all the circumstances, provides a sufficient point of distinction of that case from this one, so that it provides meager, if any, contrary precedent of substance to our conclusion here.

## IV

The arguments advanced by the taxpayer do not persuade us:

1. The taxpayer, of course, quite correctly insists that

unrealized appreciation of portfolio securities does not enter into the determination of "earnings and profits," within the meaning of § 533 (a). As noted above, we agree. The Government does not contend otherwise. It does not follow, however, that unrealized appreciation is never to be taken into account for purposes of the accumulated earnings tax.

As has been pointed out, the tax is imposed only upon accumulated taxable income, and this is defined to mean taxable income as adjusted by factors that have been described. The question is not whether unrealized appreciation enters into the determination of earnings and profits, which it does not, but whether the accumulated taxable income, in the determination of which earnings and profits have entered, justifiably may be retained rather than distributed as dividends. The tax focuses, therefore, on current income and its retention or distribution. If the corporation has freely available liquid assets in excess of its reasonable business needs, then accumulation of taxable income may be unreasonable and the tax may attach. Utilizable availability of the portfolio assets is measured realistically only at net realizable value. The fact that this value is not included in earnings and profits does not foreclose its being considered in determining whether the corporation is subject to the accumulated earnings tax.

2. We see nothing in the "realization of income" concept of *Eisner* v. *Macomber,* 252 U. S. 189 (1920), that has significance for the issue presently under consideration. There the Court held that a dividend of common shares issued by a corporation having only common outstanding was not includable in the shareholder's gross income for income tax purposes. The decision may have prompted the shift, noted above and effected by the Revenue Act of 1921, of the incidence of the accumulated

earnings tax from the shareholders to the corporation. The case also emphasizes the realization of income with respect to a tax on the shareholder. We note again, however, that the accumulated earnings tax is not on unrealized appreciation of the portfolio securities. It rests upon, and only upon, the corporation's current taxable income adjusted to constitute "accumulated taxable income."

3. The taxpayer also argues that the effect of the Court of Appeals decision is to force the taxpayer to convert its appreciated assets in order to meet its business needs. It suggests that management should be entitled to finance business needs without resorting to unrealized appreciation. The argument, plainly, goes too far. On the taxpayer's own theory that marketable securities may be taken into account at their cost, a situation easily may be imagined where some conversion into cash becomes necessary, if the corporation is to avoid the accumulated earnings tax.

That our decision does not interfere with corporate management's exercise of sound business judgment, and that it does not amount to a dictation to management as to when appreciated assets are to be liquidated, was aptly answered by the Court of Appeals:

"This decision does not force the corporation to liquidate these securities at any time when a sale would be financially unwise, but only compels the corporation to comply with the proscriptions of the Code and refrain from accumulating excessive earnings and profits. That taxpayer, as a consequence of its own sound judgment in making profitable investments, must sell, exchange or distribute to the shareholders assets in order to avoid an excessive accumulation of earnings and thus comply with the Code's

requirements is no justification for precluding its application." 493 F. 2d, at 428.

We might add that the existence of the Code's provisions for the accumulated earnings tax, of course, will affect management's decision. So, too, does the very existence of the corporate income tax itself. In this respect, the one is no more offensive than the other. Astute management in these tax-conscious days is not that helpless, and shrinkage, upon liquidation, of one-fourth of the appreciation hardly equates with loss. Such business decision as is necessitated was expressly intended by the Congress. All that is required is the disgorging, at the most, of the taxable year's "accumulated taxable income."

4. It is no answer to suggest that our decision here may conflict with standard accounting practice. The Court has not hesitated to apply congressional policy underlying a revenue statute even when it does conflict with an established accounting practice. See, *e. g., Schlude* v. *Commissioner,* 372 U. S. 128 (1963); *American Automobile Assn.* v. *United States,* 367 U. S. 687, 692–694 (1961). It is of some interest that the taxpayer itself, for the tax years under consideration, reflected the market value as well as the cost of its marketable securities on its balance sheets. App. 112, 118. This appears to be in line with presently accepted practice. See R. Kester, Advanced Accounting 117–118, 122–124 (4th ed. 1946).

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

Mr. Justice Powell, with whom Mr. Justice Douglas and Mr. Justice Stewart join, dissenting.

The Court's decision departs significantly from the relevant statutory language, creates a rule of additional

tax liability that places business management in a perilous position, and vests in the Internal Revenue Service an inappropriate degree of discretion in administering a punitive statute.   I therefore dissent.

## I

Petitioner, a corporation with 34 stockholders, is engaged in selling office supplies and equipment.   In the late 1950's, because petitioner was a retail outlet for equipment of the Xerox Corp., it invested $147,-000 of its earnings and profits in securities of Xerox. The market value of that investment increased substantially over the years, and by the end of petitioner's 1965 and 1966 tax years the unrealized market appreciation [1] of those securities approximated $1,475,000 and $2,416,000 respectively.[2]   For the purpose of determining the applicability of the additional penalty tax liability under 26 U. S. C. § 531, the Commissioner valued these securities at their year-end market price.   He thereupon assessed the tax here at issue.

The question is one of statutory construction:   In determining whether a corporation has accumulated earnings and profits in excess of reasonable business needs within the meaning of 26 U. S. C. § 533 (a), are assets purchased with earnings and profits to be valued at the amount invested in them—their cost—or at their market

[1] Unrealized appreciation is the difference between the cost basis of a retained asset and its market or appraised value, where the latter exceeds cost.

[2] The cost basis for petitioner's Xerox securities for the 1966 tax year was some $14,000 less than for 1965, apparently reflecting the payment as a dividend of 870 shares of Xerox stock in 1965.   The "appreciation" figures used herein come from Petitioner's Brief and vary somewhat from the figures used by the Government, but the differences are insignificant in the context of this case.   Rounded figures are used throughout this opinion.

price,[3] which reflects both cost and unrealized appreciation? The question has not heretofore been decided by this Court and has been considered infrequently by other federal courts.

## II

I address first the statutory language, which in my view is controlling. Section 531 imposes a tax "[i]n addition to other taxes imposed by this chapter . . . on the accumulated taxable income . . . of every corporation" identified by § 532. Section 532 makes the § 531 tax applicable to every corporation "formed or availed of for the purpose of avoiding the income tax with respect to its shareholders . . . by permitting earnings and profits to accumulate instead of being divided or distributed." If "the earnings and profits of a corporation are permitted to accumulate" beyond its reasonable needs, § 533 establishes a rebuttable presumption that the corporation is one "formed or availed of for the purpose of avoiding the income tax" and that it is therefore liable for the § 531 tax.

The central element of this statutory scheme is the unreasonable accumulation of earnings and profits beyond the corporation's reasonable needs. It is stipulated in this case that there is no unreasonable accumulation and no additional tax unless the unrealized appreciation of the Xerox securities is *added* to petitioner's actual accumulated earnings and profits (*i. e.*, to its earned sur-

---

[3] The Court refers to net liquidation value, which reflects the asset's current market price less the costs and expenses attendant to its liquidation. The Court thus seeks to identify the sum that would be made available by a hypothetical sale of the asset in question, although nothing in the statute requires such a liquidation. For the purpose of discussion, I will refer simply to market value or market price.

plus account).[4]   Under normal concepts of tax law
and accounting the Government's position is there-
fore untenable on its face.   Unrealized appreciation of
assets is not considered in computing ordinary corporate
or individual taxable income.   Indeed, sound accounting
practice requires that assets be recorded and carried at
cost,[5] and this requirement is enforced with respect to
filings with the Securities and Exchange Commission
(SEC).   Similarly, if assets of a corporation are dis-
tributed to shareholders "in kind," the company is cred-
ited for a dividend payment only on the basis of the cost
of those assets, not their appreciated value.

   In view of this unanimity of law and practice, what
theory is devised by the Government and the Court
today as justification for a different rule for this penalty
tax?   I look to the Court's opinion for the answer.   It
is conceded that "unrealized appreciation does not enter
into the computation of the corporation's . . . [accumu-
lated] 'earnings and profits.' "   *Ante,* at 627.   Neverthe-

---

   [4] There may be some ambiguity in the critical language stating
the Court's theory of the case, *ante,* at 626, as to whether it
intends the term "accumulated" to refer only to earnings and profits
accumulated in the tax year in question or to all accumulated and
undistributed earnings as shown by the corporation's earned surplus
account.   I assume the Court refers to the latter, as the statutory
language and purpose contemplate consideration of the total ac-
cumulation in determining whether the retention of earnings and
profits of a given year has been in excess of the amount justified
by reasonable business needs.

   [5] It is not unusual, of course, for a corporation also to show
parenthetically on its balance sheet, or in a footnote thereto, the
market price of assets when that figure can be ascertained readily.
But unrealized appreciated value, whether based on market price
or an appraisal of the asset, is normally not included in the sum
of a corporation's assets or in its surplus account on the liability
side of its balance sheet.

less, the Court holds that such appreciation "becomes important" and must be taken into account "in measuring [the] reasonableness" of such accumulation. *Ante,* at 628. In short, the Court construes the statute to mean that although unrealized appreciation is not includable in computing earnings and profits, it is includable in determining whether earnings and profits have been accumulated unreasonably.

The statute provides no basis whatever for this distinction. According to its own terms, selected with full knowledge of accepted tax and accounting principles, the penalty tax applies only if there is an unreasonable accumulation of *earnings and profits;* the statute contains no reference to the addition of unrealized appreciation to the accumulated earnings and profits which constitute the only basis for imposing the tax. Nor does the history or purpose of the statute support the "add on" of an unrealized increment of value conceded by the Court to be neither earnings nor profits. By authorizing this "add on," the Court's decision effectively converts the tax on excessive accumulation of earnings and profits to a tax on the retention of certain assets that appreciate in value. Although current accumulated taxable income remains the measure of the tax, its application in many cases will be controlled simply by the existence of unrealized appreciation in the value of these assets.

The purpose of the statute, as the Court states, is "to force the distribution of unneeded corporate earnings." *Ante,* at 624. Such a distribution is accomplished by the payment of dividends, which normally are declared and paid only out of current earnings or earned surplus, determined in accordance with sound accounting practice. Absent authorization in a statute or corporate charter, corporate directors who pay dividends from unrealized

appreciation risk personal liability at the suit of stock-
holders or injured creditors.[6]

### III

The plain language of the Code resolves this case for
me.   But even if the statute could be thought ambigu-

[6] See 11 W. Fletcher, Cyclopedia of the Law of Private Corpora-
tions §§ 5329, 5329.1, 5335, 5335.1 (1971).   Some States have
statutes expressly prohibiting recognition of unrealized apprecia-
tion as a source upon which a corporation can rely in determin-
ing the amount of a dividend that legally can be paid.   *E. g.*, Cal.
Corp. Code §§ 1502, 1505 (1955); Ind. Ann. Stat. § 23–1–2–15 (a)
(1972).   Other States have statutes allowing limited recognition
of unrealized appreciation.   *E. g.*, Minn. Stat. § 301.22 (1) (1974)
(a corporation may take into account appreciation of "securities
having a readily ascertainable market value"; otherwise, unrealized
appreciation may not be counted in computing earnings avail-
able for dividends); Ohio Rev. Code Ann. § 1701.33 (A) (Supp. 1974)
(allows only share dividends to be paid from unrealized apprecia-
tion).   The decisional law of States lacking precise statutory guid-
ance generally prohibits reliance on unrealized appreciation.   11
W. Fletcher, *supra*, § 5335.1;   H. Henn, Handbook of the Law of
Corporations and Other Business Enterprises § 320, pp. 652–653
(1970).

Georgia's law follows the Model Business Corporation Act, allow-
ing payment of cash or property dividends only out of earned
surplus or current earnings.   Ga. Code Ann. § 22–511 (a) (1) (1970);
Model Bus. Corp. Act § 45 (a).   Share dividends may be paid out
of capital surplus on certain conditions, Ga. Code Ann. § 22–511
(a) (4);   Model Bus. Corp. Act § 45 (d), and stricter conditions
govern the declaration of cash or property dividends out of capital
surplus.   Ga. Code Ann. § 22–512;   Model Bus. Corp. Act § 46.
Commentators have suggested that under the Model Act a corpora-
tion could revalue its assets, creating capital surplus out of the
unrealized appreciation, and then pay dividends out of the capital
surplus, but that course of action is considered quite risky for the
directors.   Bugge, Unrealized Appreciation as a Source of Share-
holder Distributions Under the Wisconsin Business Corporation Law,
1964 Wis. L. Rev. 292, 300–304, 312–313; Hackney, The Financial
Provisions of the Model Business Corporation Act, 70 Harv. L. Rev.

ous on the point, the tax is, as the Court concedes, a "penalty and therefore [must] be strictly construed . . . ." *Ante,* at 627.  See *Commissioner* v. *Acker,* 361 U. S. 87, 91 (1959).  This means, at a minimum, that doubts and ambiguities must be resolved in favor of a fair and equitable construction that is as free from the hazards of uncertainty as the statutory language and purpose will allow.  It seems to me that the Court's opinion ignores the meaning of this canon of construction.  Rather than construe the statute narrowly, today's decision extends the presumptive reach of this tax beyond the language of the Code and creates a number of perplexing uncertainties.

Businesses normally are conducted, and management decisions made, on the basis of financial information that is maintained in accordance with sound accounting practice.  The most elementary principle of accounting practice is that assets are recorded at cost.  This is true with respect to the computation of earnings and profits, payment of ordinary corporate taxes, determination of dividend policy, and reporting to stockholders, the SEC, and other regulatory agencies.  Corporate books and records are audited only on that basis.  Whatever may be said for the Court's view of the "unreality" of adhering to the principles of sound accounting practice, *ante,* at 629–630, those principles are the best system yet devised for guiding management, informing shareholders, and determining tax liability.  They have the not inconsiderable virtues of consistency, regularity, and certainty—virtues that also assure fairness and reasonable

---

1357, 1377–1381 (1957).  Under Georgia law, Ga. Code Ann. § 22–715 (c), as under the Model Act § 48, a director is not liable for an illegal dividend distribution if in computing the amount available for dividends he considers the corporate assets at their "book value."

predictability in the Commissioner's administration of this penalty tax.

The Court today abandons accounting principles confirmed by the wisdom of business experience and announces a new rule with far-reaching consequences. In my view, this rule will create uncertainty and open wide possibilities for unfairness.

## A

Both taxpayers and the Government know what is meant by "cost basis," and a corporation's earned surplus account, which reflects accumulated earnings and profits from which dividends normally are paid, is an established accounting fact. There is no comparable certainty or dependability in the rule devised by the Court:

> "Cost of the marketable securities on the assets side of the corporation's balance sheet would appear to be largely an irrelevant gauge of the taxpayer's *true financial condition. . . . Realistic financial condition* is the focus . . . of the Commissioner's inquiry in determining the applicability of the accumulated earnings tax."  *Ante,* at 629–630 (emphasis added).

In this case, involving marketable securities, the computation of the true value for purposes of the tax appears at first blush to present no serious problem of uncertainty. The Court simply equates market price at the end of the tax year with true value, and adds the resulting excess over cost to the book value of the securities. Apart from the questionable assumption that market quotations represent the true value of a retained common stock, the Court's new formulation poses perplexing definitional questions for management.

An initial uncertainty results from the Court's ambiguous use of the term "securities." As defined in the

Securities Act of 1933 and the Securities Exchange Act of 1934, the term is quite comprehensive.[7] Even so, its meaning is not always self-evident, as can be seen by examining some of the extensive litigation on this question. See, e. g., *1050 Tenants Corp.* v. *Jakobson,* 503 F. 2d 1375 (CA2 1974); *SEC* v. *Glenn W. Turner Enterprises, Inc.,* 474 F. 2d 476 (CA9), cert. denied, 414 U. S. 821 (1973); *Lehigh Valley Trust Co.* v. *Central National Bank of Jacksonville,* 409 F. 2d 989 (CA5 1969).

In addition, uncertainties will arise in ascertaining whether the asset is sufficiently "readily marketable" to satisfy the Court's test. The Court attaches significance to whether the security is "listed" on a stock exchange. It is indeed true that the great majority of common stocks listed on the New York Stock Exchange are readily marketable, unless the number of shares to be sold is too large for the market to absorb. The same cannot be said, however, of all bonds listed on that Exchange. Moreover, there are other exchanges on which securities are listed and traded: the American Stock Exchange, over the counter, and scores of local exchanges. While many securities traded on these exchanges may be "readily marketable," perhaps the majority could not fairly be so characterized. In countless situations corporate management will be unable to determine, short of attempting to sell the security, whether it is "readily marketable" or not.

---

[7] Among other things, the term "security" includes stocks, bonds, debentures, certificates of interest or participation in profit-sharing agreements, collateral trust certificates, investment contracts, voting-trust certificates, fractional undivided interests in oil, gas, or other mineral rights, or "in general, any interest or instrument commonly known as a 'security . . . .'" 48 Stat. 74, as amended, 15 U. S. C. § 77b (1); 48 Stat. 882, as amended, 15 U. S. C. § 78c (10). See *United Housing Foundation, Inc.* v. *Forman,* 421 U. S. 837 (1975).

## B

The uncertainty engendered by today's opinion will not be limited to its undifferentiated treatment of marketable securities. A more fundamental question arising from the rationale of the Court's decision is whether the test of "true" or "realistic" financial condition will be applied to other assets. Nothing in the relevant statutory provisions suggests a distinction between securities and other assets, or even between assets with varying degrees of marketability. The Court nevertheless appears to read into the statutes a distinction based on "liquidity," at various points referring interchangeably to "readily marketable securities," "current assets," and "quick or liquid assets." *Ante,* at 622, 628. Although the Court's holding is limited in this case to readily marketable securities, see *ante,* at 629 n. 9, its rationale is not so easily contained.

The Court states categorically that the "focus" of the Commissioner's inquiry, in determining the application of this tax, must be on what it calls true or realistic financial condition. *Ante,* at 629–630. In view of this postulation, and the absence of any distinction in the statute among types of assets, is the Commissioner now free to include in his computation the unrealized appreciation of all corporate assets? Once cost basis is abandoned, and "realistic" value becomes the standard, the uncertainties confronting prudent management in many cases will be profoundly disquieting. To be sure, read narrowly, the Court's decision applies only to readily marketable securities, with emphasis on "liquidity." But this is another relative term, depending on the nature of the asset and the uncertainties of market conditions at the time.

The potential sweep of the Court's decision is forecast by the response of Government counsel to questions

about unrealized appreciation on real estate. At one point counsel stated that real estate would not be sufficiently liquid to be includable at market value in the tax calculation, Tr. of Oral Arg. 36, but he later qualified this statement by suggesting that land might be includable if it could be established that it was readily marketable, *id.*, at 42.[8]

The types of assets in which corporations lawfully may invest earnings and profits embrace the total range of property interests. They include, to name only a few examples, unimproved real estate within the anticipated growth pattern of a major urban area, improved real estate, unlisted securities of growth corporations that have not "gone public," undivided interests in oil or mining ventures, and even objects of art. At various times and depending upon conditions, any of these assets may be viewed as—and in fact may be—readily marketable and therefore "liquid." The unrealized appreciation of such assets may well bear upon the realistic financial condition of a corporation, however it is defined. In light of these economic facts, the sweep of today's decision presents problems both for corporate taxpayers and the Government.[9]

---

[8] The following hypothetical example suggests the difficulty of application of today's decision. If petitioner had invested the same $147,000 of earnings in southern pine timberlands, and if by the end of the tax years in question the unrealized appreciation in value of these lands was precisely the same $1,475,000 and $2,416,000, respectively, as was the appreciation of the Xerox stock here at issue, would the Commissioner have been entitled to take the unrealized appreciation into account? In many instances, well-situated timberlands have appreciated in value as much as or more than most marketable securities. Such lands are not carried on corporate balance sheets as current assets, and yet experience indicates that growing timber and timberlands are often highly marketable.

[9] I hardly think that the Court's brandishment of the threat of criminal liability for willful tax evasion through investment in a

## C

I further think that the Court's decision to attach significant tax consequences to the market price of a volatile stock at a particular point in time will lead to unfairness in the application of the accumulated earnings tax. The Court's net liquidation formulation seems to assume, and nothing in the opinion dispels this assumption, that readily marketable assets are to be valued as of the end of the tax year in question. Moreover, the Court apparently would treat all marketable securities the same for the purpose of this valuation. No distinction is drawn or even suggested among the wide variety of securities that are held as corporate assets.

The market price of a short-term Treasury note, at most only fractionally different from its cost basis, would represent its value under any test. But few financial analysts or economists would say that the market quotation of a common stock at any particular time necessarily

---

particular type of asset, see *ante,* at 630 n. 11, will suffice to deter future investment decisions made with the intention of avoiding the pitfalls of this decision. I cannot agree with the Court's suggestion that this motivation would convert an otherwise legitimate investment choice into a criminal offense. Corporate management considers the potential tax implications of countless business decisions and might reasonably be expected to assess the possible impact of a choice between investing in nonliquid or liquid assets on its potential future liability for the accumulated earnings tax.

"The fact that the incidences of income taxation may have been taken into account by arranging matters one way rather than another so long as the way chosen was the way the law allows, does not make a transaction something else than it truly is . . . ." *Commissioner* v. *Wodehouse,* 337 U. S. 369, 410 (1949) (Frankfurter, J., dissenting).

This is especially true where questions of criminal liability are involved.

reflects its "true" or "realistic" value *unless* the stock is sold at that price.[10] Over a sufficiently long term, the market price of a common stock will reflect, and vary with, the fundamental strength of the issuing corporation's balance sheet, its earnings record, and its future earnings prospects. But a variety of other factors also affect market price, producing wide swings that do not necessarily correspond to those economic facts. These factors include current conditions of supply and demand in the stock market, immediate confidence in the market in general and in the overall state of the economy, international stability or instability, notions of what is fashionable to buy at a particular time, and a variety of other intangibles. The extent to which the market prices of common stocks fluctuate, often without regard to any concept of "real" value, is illustrated by the tables in the Appendices to this opinion.

Bearing in mind the actual variations in the price of

---

[10] The following swings in the value of Xerox stock illustrate the point: on May 16, 1975, the high was 87 and the low 78½. If petitioner continued to own 10,000 shares, its potentially available source of funds would have shrunk by $85,000 in a single day. In the month of August 1974, Xerox varied in market price from 98 to a low of 74¼, a 24.2% swing. Again, assuming a holding of 10,000 shares, the owner would have suffered paper "losses" in that one month of approximately $237,500, or about one-fourth of market value. Considering the entire calendar year of 1965, Xerox sold as high as 71 and as low as 31, a variation on the down side of 55.9% and on the up side of 120%. In dollars, a person who bought 10,000 shares of Xerox in 1965 at its lowest and sold at the highest price would have enjoyed a pretax profit of $400,000. But in 1974, in which the high was 127 and the low 49, a taxpayer whose Xerox stock was assessed on the day of the market's peak, and who continued to own it, would find himself at the later date having "lost" 61% of what this Court deems the "realistic" or "true" value of the investment. See Appendix A–1, *infra*.

Xerox stock, can it be said that its market price at any given time fairly represents its true or realistic value for the purpose of determining whether earnings and profits have been accumulated unreasonably? The negative answer to this question is indicated, at least for me, by the following hypothetical example. In 1965, one of the tax years at issue in this case, the highest price at which Xerox sold was $71 and the lowest was $31. If two competing corporations each owned 10,000 shares of Xerox stock purchased prior to 1965 at the identical price of $31 per share, and Corporation A's tax year ended on the day that Xerox hit $71, while Corporation B's tax year ended on the day it hit $31, Corporation A would have had an unrealized appreciation of $400,000, whereas Corporation B would have had none.

By departing from the cost-basis standard of sound accounting practice, and compelling reliance on an isolated market price of a retained common stock, the Court itself departs from its avowed goal of "economic reality." *Ante,* at 627. An average price range at which the stock might have been sold over a relatively long period might produce a more equitable result in some cases. It would not, however, alleviate the basic problem inherent in the Court's formulation. The taxpayer still could be penalized for having failed to consider, in planning future business needs, the highly ephemeral "value" of unrealized appreciation on common stock. The effect of today's decision is to hold business management accountable for unrealized appreciation as if it were cash in hand, probably forcing corporate management in many cases to liquidate securities that otherwise it would have elected to retain.[11]

---

[11] The wide gyrations in value of some of the equity securities listed in the Appendices to this opinion illustrate the point. For example, on May 16, 1975, the common stock of the Falstaff Corp. fell 20.6% in a single day. The Court's opinion assumes

Management decisions during the course of a year, including decisions whether and when to pay dividends and in what amounts, cannot be made intelligently on the basis of an asset so volatile that it may depreciate in market value as much as 8% in a single day and 61% in a year. Uncertainty of this magnitude could only be avoided by liquidation of assets that have appreciated in value. I find nothing in the language or purpose of this tax that justifies such detrimental interference with sound corporate management.

## IV

The Court places major reliance on *Helvering* v. *National Grocery Co.*, 304 U. S. 282 (1938), finding that that opinion "forecloses the present taxpayer's case." *Ante*, at 631. I respectfully suggest that the Court's interpretation of *National Grocery* will not withstand close scrutiny of the facts or its actual holding.[12]

that corporate management should plan to satisfy future business needs from the unrealized appreciation in value of such securities at a given point in time. The instability of market prices of common stocks suggests that this assumption is unsound.

[12] The basic facts of *National Grocery* are not fully revealed in this Court's opinion, but must be obtained from the opinions of the Board of Tax Appeals, 35 B. T. A. 163 (1936), the Court of Appeals for the Third Circuit, 92 F. 2d 931 (1937), and the briefs filed in this Court by the parties. In addition to those set forth above, the following are relevant: the decline in market value of the taxpayer's listed securities in the fiscal year aggregated $943,500; the $2,000,000 shrinkage figure mentioned by this Court included, in addition, the taxpayer's attempted elimination of $1,068,000 cost value of bank stocks claimed to be wholly unmarketable. Brief for Respondent in No. 723, O. T. 1937, pp. 34–35. In addition, as appears from the opinion of the Court of Appeals, National Grocery also claimed "that [its] merchandise shrank in value well on to a quarter million dollars, and the real estate declined in value $125,000." 92 F. 2d, at 933. All of this alleged depreciation and shrinkage was

National Grocery, its stock owned by a sole share-holder, was organized in 1908 with an authorized capital of $5,000; its business prospered over the years, so that by January 31, 1931 (the taxable year there at issue), its earned surplus was $7,939,000. These earnings notwith-standing, National Grocery's "only dividends . . . ever paid . . . up to January 31, 1931, were a dividend of $25,000 in 1917, and a dividend of a like amount in 1918." *National Grocery Co.* v. *Commissioner*, 35 B. T. A. 163, 164 (1936). The corporation's net profits for the four fiscal years preceding fiscal year 1931, all of which were retained rather than distributed, averaged in excess of $800,000 annually. National Grocery earned some $864,-000 during the tax year in question, none of which was distributed as a dividend. Addressing the taxpayer's attempt to offset the depreciation of some of its assets, the Court noted:

> "Depreciation in any of the assets is evidence to be considered by the Commissioner and the Board in determining the issue of fact whether the accumu-lation of profits was in excess of the reasonable needs of the business. But obviously depreciation in the market value of securities which the corporation con-tinues to hold does not, as matter of law, preclude a finding that the accumulation of the year's profits was in excess of the reasonable needs of the busi-ness." 304 U. S., at 291.

When *National Grocery* is read in light of the facts and issues there presented—as it must be in order to understand the Court's passing statement—it is readily apparent that the holding in that case does not govern the issue here. The central issue there was the

claimed to have occurred in the taxable year, and was sought to be offset against net earnings for that year.

definition of "gains and profits": specifically, whether "gains," a term replaced in the present statute by "earnings," qualified the meaning of "profits." The Court apparently felt justified in devoting little attention to the issue, for it was plain in light of the huge accumulation of earnings over time that the taxpayer would be liable even if it were allowed to offset the asserted depreciation. Finally, it is significant that National Grocery's "accumulation of earnings" was computed on the basis of book value or cost. Indeed, all of the relevant figures were so computed, including the $7,393,000 surplus that had been accumulated over time.

I therefore find no justification for the view that *National Grocery* forecloses consideration of the question here presented. Moreover, even if I could agree with the Court's interpretation of that case, I would refuse to follow a rationale so plainly at odds with the statutory language and so conducive to uncertainty and unfairness.

## V

The uncertainties the Court has now read into this penal statute correspondingly vest in the Internal Revenue Service an inappropriate latitude in its administration. In light of today's decision, the Commissioner will have wide and virtually uncontrolled discretion in deciding which corporations will be subject to additional taxation, or at least in deciding which will be required to rebut the presumption that earnings were accumulated to evade shareholder tax liability. Until today's decision, management, in trying to anticipate what a Commissioner would deem an unreasonable accumulation, at least could rely on the corporation's earned surplus account as establishing its accumulated earnings and profits. Now this dependable benchmark has become an "irrelevant gauge" of a corporation's "true financial con-

dition," and in many cases management can only speculate about the Commissioner's future determination of values nowhere reflected in the corporation's books. As commentators have noted, see B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 8.01, p. 8–4 (3d ed. 1971), the decision to impose the accumulated earnings tax inevitably involves "a hindsight verdict on management's business judgment." The Court's decision does not impose identifiable standards on the Commissioner's exercise of this extraordinary "hindsight" authority, but leaves it open-ended. It is unlikely, to say the least, that Congress intended to leave small and medium-sized businesses—those most often the target of this tax—exposed to this degree of administrative discretion in the imposition of a potentially heavy penalty tax.

## APPENDIX A–1 TO OPINION OF POWELL, J., DISSENTING

The volatility and transient character of market prices of a common stock are illustrated by the following tables:*

### TABLE I

### XEROX CORP. COMMON STOCK†

|  | High | Low | % Change High to Low |
|---|---|---|---|
| Fluctuations in a single day: |  |  |  |
| June 14, 1965.......... | 48.25 | 45 | − 6.7 |
| May 16, 1975.......... | 87 | 78.50 | − 9.8 |
| Fluctuations in a single month: |  |  |  |
| November 1965.......... | 66.50 | 57.50 | −13.6 |
| August 1974............ | 98 | 74.25 | −24.2 |
| Fluctuations in a single year: |  |  |  |
| 1965................... | 71 | 31 | −56.3 |
| 1974................... | 127 | 49 | −61.4 |

---

*Except as noted, all data in this Appendix were taken from published New York Stock Exchange quotations. The information presented here is selective and presented for illustrative purposes.

†All Xerox quotations take into account the 1965 three-for-one split.

APPENDIX A-2 TO OPINION OF POWELL, J., DISSENTING

TABLE II

SELECTED STOCK RANGES DURING 1965*

| Name of Company | High | Low | Close | Change Open to Close | Percent Change High to Low | Percent Change Open to Close |
|---|---|---|---|---|---|---|
| Chrysler Corp. | 62¼ | 41⅛ | 53⅜ | − 7⅞ | −33.1% | − 12.5% |
| Fairchild Camera. | 165¼ | 27¼ | 150½ | +123 | −83.5% | +447.3% |
| Financial Federation. | 37¼ | 19⅝ | 23⅞ | − 13⅛ | −47.3% | − 35.5% |
| General Dynamics | 68¼ | 35 | 56¾ | + 21¾ | −48.7% | + 62.1% |
| W. T. Grant. | 62¼ | 35⅞ | 62¼ | + 25¾ | −42.4% | + 70.5% |
| Grolier, Inc. | 60½ | 37 | 55¾ | — | −38.8% | — |
| Gulf & Western Ind. | 102 | 31⅛ | 92⅞ | + 61⅛ | −69.5% | +192.5% |
| KLM Airlines | 81⅞ | 19¾ | 79 | + 59 | −75.9% | +295.0% |
| Ling Tempco Vaught. | 58 | 17¼ | 48¼ | + 30¾ | −70.3% | +175.7% |
| Pan American Airways. | 55⅝ | 25¼ | 51⅞ | + 22⅝ | −54.6% | + 79.4% |
| Pennsylvania Railroad | 65 | 35⅞ | 64⅜ | + 25¾ | −46.0% | + 66.7% |
| Polaroid Corp | 130 | 44¼ | 116⅝ | + 70¾ | −66.0% | +154.2% |
| RCA Corp. | 50½ | 31 | 47¼ | + 13⅜ | −38.6% | + 39.5% |
| United Airlines | 118⅝ | 58⅝ | 104¾ | + 45½ | −50.6% | + 76.8% |
| White Consolidated Ind. | 49½ | 17⅜ | 48¾ | + 30¾ | −64.9% | +170.8% |
| Xerox Corp. | 215 | 94⅞ | 202 | +103⅜ | −55.9% | +104.8% |

## RANGE IN AVERAGES

| | 12/31/64 | High | Low | 12/31/65 |
|---|---|---|---|---|
| Dow Jones Industrial Average | 874.13 | 969.26 | 840.59 | 969.26 |
| Percent Change High to Low | | −13.3% | | |
| Standard & Poor's 500 Index | 84.75 | 92.63 | 81.60 | 92.43 |
| Percent Change High to Low | | −11.9% | | |

## SOME PRICES AS OF MAY 12, 1975, OF SELECTED COMPANIES LISTED ABOVE†

| | | |
|---|---|---|
| Chrysler Corp. | 12¼ | |
| W. T. Grant | 9½ | (Adjusted for 2 for 1 Split—1966) |
| Grolier, Inc. | 6 | (Adjusted for 2 for 1 Split—1966) |
| Pan American Airways | 9¾ | (Adjusted for 2 for 1 Split—1967) |
| Pennsylvania Central | 1⅝ | |
| Polaroid Corp. | 63¼ | (Adjusted for 2 for 1 Split—1968) |
| RCA Corp. | 17¾ | |
| UAL, Inc. (United Airlines) | 42 | (Adjusted for 2 for 1 Split—1966) |
| Xerox Corp. | 258¾ | (Adjusted for 3 for 1 Split—1969) |

*Source—New York Times—Monday, January 17, 1966—for stock ranges only.
†Prices have been adjusted for additional shares received as a result of stock splits.

APPENDIX A–3 TO OPINION OF POWELL, J., DISSENTING

## TABLE III

### SELECTED STOCK RANGES DURING 1974*

| Name of Company | High | Low | Close | Change Open to Close | Percent Change High to Low | Percent Change Open to Close |
|---|---|---|---|---|---|---|
| ACF Industries | 61¼ | 28¾ | 33 | −24⅞ | −53.0% | − 43.0% |
| Addressograph-Multigraph | 11¾ | 3 | 3⅜ | − 6½ | −74.5% | − 65.8% |
| Citizens & Southern Realty | 31¾ | 2 | 2⅝ | −26¾ | −93.7% | − 91.1% |
| Chrysler Corp | 20⅛ | 7 | 7¼ | − 8⅜ | −65.2% | − 53.6% |
| Coca Cola Co | 127¾ | 44⅝ | 53 | −73½ | −65.1% | − 58.1% |
| Combustion Engineering | 106¼ | 21⅝ | 26¼ | −78¾ | −79.6% | − 75.0% |
| Consolidated Edison | 21½ | 6 | 7½ | −11¼ | −72.1% | − 60.0% |
| Continental Illinois Corp | 59¼ | 23¼ | 26⅝ | −25¼ | −60.8% | − 48.7% |
| Cousins Mortgage | 23¾ | 1⅛ | 1⅜ | −18⅞ | −95.3% | − 93.2% |
| E. I. duPont | 179 | 84½ | 92¼ | −66¾ | −52.8% | − 42.0% |
| Eastman Kodak | 117½ | 57⅝ | 62⅞ | −53⅛ | −51.0% | − 45.8% |
| Fidelity Mtge. Invest | 10¼ | 9/16 | 15/16 | − 5 15/16 | −94.5% | − 86.4% |
| Foster Wheeler | 64½ | 13 | 15⅛ | −45 | −79.8% | − 74.8% |
| Holly Sugar | 39 | 12⅛ | 26¼ | +13¾ | −68.9% | +110.0% |
| Honeywell, Inc. | 86¼ | 17½ | 21 | −49⅛ | −79.7% | − 70.1% |

| Name of Company | High | Low | Close | Change Open to Close | Percent Change High to Low | Percent Change Open to Close |
|---|---|---|---|---|---|---|
| Moore McCormack Resources | 34¼ | 12⅜ | 28½ | +15¾ | −63.9% | +123.5% |
| RCA Corp. | 21½ | 9¼ | 10¾ | − 7¾ | −57.0% | − 41.9% |
| Stone & Webster | 89⅞ | 31½ | 33⅜ | −56 | −65.0% | − 62.7% |
| Tri South Mtge. Investors | 27¼ | 2 | 2¾ | −21⅛ | −92.7% | − 88.5% |
| Union Camp Corp. | 63 | 37¼ | 38⅞ | −20⅜ | −40.9% | − 34.4% |
| Union Carbide | 46 | 31¾ | 41⅜ | + 7¼ | −31.0% | + 21.3% |
| Xerox Corp. | 127⅛ | 49 | 51½ | −71¼ | −61.5% | − 58.0% |
| Great Western United | 31¼ | 3⅛ | 24¼ | +20¾ | −90.0% | +592.9% |
| Great American Mortgages | 32 | 1 | 1⅛ | −28⅞ | −98.8% | − 96.3% |

## RANGE IN AVERAGES

| | 12/31/73 | High | Low | 12/31/74 |
|---|---|---|---|---|
| Dow Jones Industrial Average | 850.86 | 891.66 | 577.60 | 616.24 |
| Percent Change High to Low | | −35.2% | | |
| Standard & Poor's 500 Index | 97.55 | 99.80 | 62.28 | 68.24 |
| Percent Change High to Low | | −37.6% | | |

*Source—Richmond Times-Dispatch, Sunday, Jan. 5, 1975, pp. E-6, E-7—for stock ranges only.

## APPENDIX A–4 TO OPINION OF POWELL, J., DISSENTING

### TABLE IV

### WALL STREET JOURNAL

Friday, May 16, 1975, p. 33

*Daily Percentage Leaders On N. Y. Stock Exchange*

NEW YORK—The following list shows the stocks that have gone up the most and down the most based on percent of change on the New York Stock Exchange regardless of volume for Thursday.

Net and percentage changes are the difference between the previous closing price and yesterday's last price.

### UPS

| | Name | Sales (hds) | High | Low | Last | Net | | | Pct. |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Welbilt Cp...... | 56 | 1¼ | 1 | 1¼ | + | ¼ | Up | 25.0 |
| 2 | Int T&T pfF.... | 1 | 68 | 68 | 68 | + | 8 | Up | 13.3 |
| 3 | IDS Rlty Tr.... | 293 | 5⅜ | 4⅞ | 5⅜ | + | ⅝ | Up | 13.2 |
| 4 | Centrn Data.... | 811 | 19½ | 17⅜ | 18⅝ | + | 1¾ | Up | 10.4 |
| 5 | Texfi Ind...... | 13 | 5⅜ | 5¼ | 5⅜ | + | ½ | Up | 10.3 |
| 6 | Heler Int pf.... | 2 | 121¼ | 121¼ | 121¼ | +11¼ | | Up | 10.2 |
| 7 | CCI Corp...... | 9 | 1½ | 1½ | 1½ | + | ⅛ | Up | 9.1 |
| 8 | Royal Ind...... | 150 | 4⅞ | 4½ | 4⅝ | + | ⅜ | Up | 8.8 |
| 9 | Readg Co....... | 58 | 3¼ | 3⅛ | 3⅛ | + | ¼ | Up | 8.7 |
| 10 | Rockower ...... | 50 | 9⅝ | 8¾ | 9½ | + | ¾ | Up | 8.6 |

### DOWNS

| | Name | Sales (hds) | High | Low | Last | Net | | Pct. |
|---|---|---|---|---|---|---|---|---|
| 1 | Falstaff ........ | 178 | 4 | 3⅜ | 3⅜ | − ⅞ | Off | 20.6 |
| 2 | SeabCst Lin..... | 2825 | 24⅜ | 22⅝ | 23¾ | − 4⅝ | Off | 16.3 |
| 3 | Emp 4.75pf..... | z100 | 4¼ | 4¼ | 4¼ | − ⅝ | Off | 12.8 |
| 4 | Bulova Wat..... | 77 | 8½ | 7½ | 7½ | − 1 | Off | 11.8 |
| 5 | LehVallnd ...... | 32 | 1¼ | 1⅛ | 1⅛ | − ⅛ | Off | 10.0 |
| 6 | Adams Drg..... | 116 | 3⅞ | 3½ | 3½ | − ⅜ | Off | 9.7 |
| 7 | Benguet B...... | 226 | 2¾ | 2½ | 2½ | − ¼ | Off | 9.1 |
| 8 | ChaseMTr ..... | 325 | 4⅛ | 3¾ | 3¾ | − ⅜ | Off | 9.1 |
| 9 | Plan Resrch..... | 212 | 4⅜ | 3⅞ | 3⅞ | − ⅜ | Off | 8.8 |
| 10 | Xerox Cp....... | 3350 | 87 | 78½ | 78⅝ | − 7⅝ | Off | 8.8 |